# Illinois Official Reports

## Appellate Court

---

### *In re K.E.S.*, 2018 IL App (2d) 170907

---

| | |
|---|---|
| Appellate Court Caption | *In re* K.E.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Cynthia S. and Edward S., Respondents-Appellants). |
| District & No. | Second District<br>Docket Nos. 2-17-0907, 2-18-0005 cons. |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | April 20, 2018<br><br>May 9, 2018<br>May 9, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Ogle County, No. 16-JA-33; the Hon. John B. Roe IV, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Brandi L. Chudoba and Mindy R. Chudoba, of Faulkner Spears & Chudoba, LLC, of Rockford, for appellant Cynthia S.<br><br>Alan W. Cargerman, of Oregon, for appellant Edward S.<br><br>Eric Morrow, State's Attorney, of Oregon (Patrick Delfino, David J. Robinson, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Spence concurred in the judgment and opinion.
Presiding Justice Hudson specially concurred, with opinion. |

**OPINION**

¶ 1    On October 12, 2017, the circuit court of Ogle County issued a dispositional order in this case that (1) made K.E.S. a ward of the court; (2) found both her mother, Cynthia S., and her father, Edward S., unfit; and (3) granted guardianship and custody of K.E.S. to the Department of Children and Family Services (DCFS). Both parents filed separate appeals, which we ordered consolidated. We affirm the trial court's finding of unfitness with respect to Edward, reverse its finding that Cynthia was unfit, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3    On December 29, 2006, K.E.S. was born to Cynthia and Edward, who were married. In 2007, Edward was arrested for domestic battery after Cynthia accused him of pushing her while she was holding K.E.S. Edward denied the accusation and was never convicted of that charge. In 2009, Edward petitioned to dissolve his marriage to Cynthia. That same year, based on further allegations by Cynthia that he abused her, an order of protection was entered against him.

¶ 4    The marriage was dissolved in 2012, and in 2013 Cynthia was granted custody of K.E.S. The custody order required Edward to go through reunification counseling with a counselor at the office of Dr. Marianne Geiger before he could have contact with K.E.S. The custody order further modified the order of protection (which was extended until 2017) to allow Edward to participate in counseling sessions at which Cynthia and K.E.S. were present. Although Edward made an initial appointment to begin the counseling, he later cancelled it as it was too expensive. As of early 2017, he had had no contact with K.E.S. since she was two years old.

¶ 5    On November 16, 2016, Cynthia and K.E.S. were in a rollover car accident, reportedly after Cynthia was driving erratically at high speed. K.E.S. was not injured, but Cynthia was hospitalized for three weeks for mental health concerns. K.E.S. was initially released into the care of Joseph Ganus. Ganus had been hired by DCFS in 2012 to assist Cynthia, who had physical limitations. He eventually moved in with Cynthia and K.E.S. as a roommate, providing housecleaning services, driving, and some medical assistance. However, after DCFS learned that Ganus did not have authority to make medical decisions for K.E.S., that the home did not have heat, and that K.E.S. was involved in truancy proceedings for school absences, a neglect petition was filed.

¶ 6    On December 22, 2016, DCFS was appointed temporary guardian and K.E.S. was placed in a foster home. Cynthia was permitted twice-weekly supervised visits with K.E.S. On February 20, 2017, the juvenile court denied Cynthia's request to extend the order of protection and Edward was permitted to begin a reunification process with K.E.S. That process began with Edward having monthly telephone conversations with K.E.S. during some of her individual therapy sessions with Dr. David Klemm, a psychologist.

¶ 7        On May 18, 2017, the State filed its second amended neglect petition, alleging that K.E.S. was neglected in that, at the time of the initial December 2016 petition, (1) Cynthia had mental health issues that prevented her from properly parenting K.E.S. and placed K.E.S. at risk, (2) K.E.S. was without proper care because Cynthia was hospitalized and Edward was barred from contact with her, (3) Cynthia's home had no heat or food, and (4) Cynthia's car accident arising from her psychological condition had placed K.E.S. in danger. At a court hearing on that same day, Cynthia stipulated to the allegations for the purpose of adjudication, and the trial court found that K.E.S. was a dependent and neglected minor.

¶ 8        The dispositional hearing began on July 11, 2017, and continued on July 31 and August 29. The evidence presented included the following.

¶ 9        DCFS and Court Appointed Special Advocates (CASA) each submitted reports dated May 31, 2017. In its report, DCFS began by noting that, due to allegations of physical aggression by Edward against Cynthia, an intact-family case was opened in March 2008. The parties separated, with Cynthia as the primary caregiver for K.E.S. In August 2008, Cynthia attempted suicide. Edward cared for K.E.S. for a short time until Cynthia could resume parenting duties. Cynthia participated in mental health treatment and addressed domestic violence issues with a different therapist at the same clinic where Dr. Geiger worked. She also attended Marriage First classes, including parenting classes, and she displayed an understanding of the skills taught. She obtained an order of protection against Edward. The case was satisfactorily closed in March 2009.

¶ 10       Cynthia had chronic medical conditions, most involving her gastrointestinal system, plus asthma, migraines, and allergies. She had been prescribed several medications. Upon her release from the hospital in December 2016, Cynthia was prescribed several psychotropic medications to aid in her stabilization. She did not fill these prescriptions, as her medical card had expired. She also did not follow up on her first referral for counseling, as Edward had been referred to the same program and she did not feel comfortable or safe attending the program.

¶ 11       In March, Cynthia began seeing Margaret Corcoran, a therapist at a different center. At the first visit, Corcoran suggested that Cynthia be hospitalized. Cynthia voluntarily admitted herself to a hospital in Dixon, where she remained for about a week and was able to obtain the medications she had been prescribed earlier. The DCFS report stated that Corcoran requested the admission because Cynthia was shaking uncontrollably and possibly depressed. At the dispositional hearing, however, Corcoran testified that she recommended hospitalization because it was the most expedient way to have Cynthia evaluated and her medication reviewed. Since then, Cynthia had been seeing Corcoran every two weeks for about three months and was compliant with all of her medications. Cynthia was doing well, and Corcoran opined that, as long as she continued to attend therapy and take her medication, she was stable enough to resume parenting K.E.S.

¶ 12       As to the home, DCFS noted that, after the home that Cynthia and Ganus had been renting went into foreclosure, Ganus bought a two-bedroom mobile home for them to live in. Ganus helped Cynthia keep track of her appointments and transported her to them. Cynthia paid the lot rent each month. The home was clean and well-stocked. Cynthia's visits with K.E.S. took place in the home and were going well.

¶ 13       As for Edward, he was a truck driver and was often on the road. When he was home, he lived with a woman named Sherrel Isler and her three children. Edward and Isler also had a

five-month-old son. However, Edward stated that he and Isler were not in a romantic relationship.

¶ 14    DCFS referred Edward to a counseling center. He arrived for his first appointment with Isler and, when told that she could not be present during his session, he refused to proceed with the counseling. Although DCFS had suggested other services, Edward declined to participate in them, pointing out that there were no allegations of abuse or neglect against him in the neglect petition. DCFS asked to include Isler and her children in the assessment and to visit their home to ensure that it was safe, but Edward and Isler refused on the ground that they were not legally required to submit to this.

¶ 15    Edward had begun having phone conversations with K.E.S. that were monitored by her therapist, Dr. Klemm. As of the end of May, he had had four such telephone "visits." Edward also met with Dr. Klemm on two occasions, at Dr. Klemm's request. Edward wanted K.E.S. to live with him, Isler, and their children.

¶ 16    DCFS also spoke with K.E.S. She was doing well at her foster home and in school. K.E.S. reported having a good relationship with Cynthia and wanted to resume living with her. K.E.S. was afraid of Edward, telling the DCFS worker that he had hit her when she was a baby and had shown up in her and her mother's "territory" even when the order of protection was in place. K.E.S. did not want to live with her father. She would prefer to live with her mother and visit with her father on weekends. If she could not live with her mother, she would rather stay with her foster mother.

¶ 17    In the report's conclusion, DCFS stated that the "safety issues" that had brought K.E.S. into care had diminished to the point that they were now "risk concerns." DCFS acknowledged Cynthia's progress in therapy and compliance with prescribed medications, albeit noting that she still appeared to have limited insight into the needs and well-being of K.E.S. and her own impact on those. DCFS also expressed concern over Edward's refusal to cooperate with the agency's suggestions, referrals, and home safety concerns. DCFS recommended that K.E.S. remain in foster care for the time being, with the goal of returning home.

¶ 18    The initial CASA report contained similar conclusions and recommendations. CASA observed a visit between K.E.S. and Cynthia, at which K.E.S. was animated and talkative. Her foster mother reported that K.E.S. came home happy after visits with her mother. CASA reported that, once the telephone "visits" with her father started, K.E.S.'s school called to report that she was not eating her lunch. Further, on May 22, 2017, Edward told K.E.S. on the phone that she would be coming to live with him after the June 7, 2017, status hearing. After this, K.E.S. again stopped eating and she hung strings across her bedroom door so that no one could come in. CASA was concerned by all of this and also by Edward's noncooperation with DCFS recommendations and requests.

¶ 19    Prior to the first day of the dispositional hearing, DCFS and CASA each submitted addenda to their reports, covering events between May 31 and July 10. DCFS included more information about K.E.S.'s individual therapy with Dr. Klemm, which had begun in early February and was going well. K.E.S. was reported to have made significant progress, developing healthy coping strategies and being able to express attachment to others. DCFS reported that, after several weeks of telephone conversations between K.E.S. and Edward during therapy, a face-to-face meeting occurred on June 12. K.E.S. was introduced to her father but was very frightened and would only say "hi" and "bye." The visit was then cut short at K.E.S.'s request. After the meeting, K.E.S. was quiet, had trouble sleeping, and asked that

any future visits be by telephone only. DCFS nevertheless recommended further in-person counselor-supervised visits so that K.E.S. could "reach a place of comfort with her father."

¶ 20 DCFS had held an administrative case review on June 28. Edward was rated unsatisfactory, as he had not signed requested consents or obtained a mental health assessment and individual therapy as requested by DCFS. Cynthia was rated as satisfactory on all of the tasks in her service plan. DCFS recommended that Cynthia be allowed unsupervised visits with K.E.S.

¶ 21 CASA's addendum expressed great concern over K.E.S.'s negative reaction to the meeting with Edward and noted that her attorney had filed a motion to restrict visitation between Edward and K.E.S. to only telephone visits until Edward had participated in individual counseling and had begun cooperating with the DCFS service plan. When CASA met with K.E.S. near the end of June, K.E.S. said that she did not want to see Edward again and asked that she not even have phone calls with Edward. Further, the CASA addendum expressed concern that Dr. Klemm had received the impression from DCFS that the goal was to have K.E.S. live with Edward. CASA was under the impression that the goal was to return K.E.S. to Cynthia.

¶ 22 In addition to the reports and addenda from DCFS and CASA, several witnesses testified at the dispositional hearing. Tracey Goodman, the DCFS caseworker, generally testified to the same observations contained in the DCFS report and addendum. She confirmed that Cynthia had complied with all of the tasks in her service plan and was taking her medication, continuing with individual therapy and domestic violence counseling, and maintaining stable housing. Cynthia was making progress, was stable, and was able to cook for K.E.S. There were no concerns with Ganus, who at this point was assisting Cynthia only with some transportation needs. Cynthia's visits with K.E.S. were going "very, very well," and DCFS recommended that at least one of her two weekly visits be unsupervised going forward.

¶ 23 As for Edward, Goodman testified that he had participated in DCFS team meetings in May and had eventually signed the requested release forms on June 12. Despite his refusal to participate in parenting education and mental health recommendations, DCFS believed that his reunification efforts through Dr. Klemm should continue.

¶ 24 Trisha Patterson, the CASA advocate for K.E.S., similarly testified in accordance with the CASA report and addendum. She had observed that K.E.S. always looked forward to visits with her mother. Patterson did not see any problem with unsupervised visits between Cynthia and K.E.S. She did not have an opinion as to whether K.E.S. should live with her mother.

¶ 25 Ganus testified that he began working for Cynthia in 2012 as part of a social service program that provides services to individuals with disabilities. He was hired to help her with housecleaning and some medical care. He eventually moved in with her as a roommate. His assistance to Cynthia had since decreased, and he now mostly drove her to appointments and to pick up medication. He considered Cynthia and K.E.S. to be "like family."

¶ 26 Ganus testified that, at the end of 2016 and in January 2017, Cynthia had episodes of behavior that concerned him. The car accident was one example. At another point, Cynthia locked herself and K.E.S. in her room and was chanting. Today Cynthia was doing great; she had had a 100% improvement and was in better shape now than when he first met her. He no longer had concerns about her mental state, and he had no concerns about her ability to parent K.E.S. or that her past behavior would return. Cynthia was a loving, caring, and nurturing parent. In the past, when he saw behavior that concerned him, he called the police, and he would do so in the future if he ever saw such behavior.

¶ 27    Ann Philips, K.E.S.'s foster mother since December 2016, testified that she and K.E.S. had discussed K.E.S.'s relationship with Cynthia. K.E.S. told her that she loved her mother very much and wanted to be with her. K.E.S. was happy when she was with Cynthia and came home from visits with Cynthia "free and giggly" and happy.

¶ 28    Corcoran, Cynthia's therapist, testified that she provided counseling to Cynthia while one of her colleagues, a nurse practitioner named Michelle Blackmer, managed Cynthia's medications under a unified treatment plan. At her first session with Cynthia on March 8, Cynthia said that she was off her medication and would like to be put back on it; achieving this quickly was why Corcoran recommended that Cynthia go to the local hospital. Cynthia attended all but two of her appointments, which she had rescheduled ahead of time. Corcoran diagnosed Cynthia with bipolar disorder; Blackmer diagnosed her as suffering from post-traumatic stress disorder (PTSD). Cynthia's therapy so far had been focused on the present rather than past mental health and domestic violence issues. That therapy, along with changes in her medications, had had a positive effect. During sessions, Cynthia was more talkative, more expressive, and "brighter." She was able to cogently and logically report how she was feeling and how things in her life were going and was in a stable environment. Cynthia wanted to actively work on her mental health so that she could get her daughter back, which she wanted more than anything.

¶ 29    Corcoran testified that a patient with bipolar disorder and PTSD who was properly taking medication could raise a child. In Corcoran's opinion, Cynthia could care for K.E.S. as long as she stayed on her medication, continued with therapy, and remained in a stable environment. Although Cynthia still at times suffered from depression, anxiety, and flat affect, she was stable. Further, these symptoms alone did not render patients unable to care for their children.

¶ 30    Dr. Geiger, a psychiatrist, treated Cynthia from 2008 to 2012. Cynthia also saw one of Dr. Geiger's colleagues, Bruce Pearson, as her primary therapist. Cynthia was suffering from anxiety and depression, which were symptoms of the PTSD that Dr. Geiger ultimately diagnosed Cynthia as having. Cynthia's therapy related to the difficulties she was having with Edward, who Cynthia said had threatened her physically and had violated an order of protection. Dr. Geiger found Cynthia's reports of domestic abuse consistent and credible. Cynthia occasionally brought K.E.S. to sessions with her, and Dr. Geiger described Cynthia as very gentle and loving with K.E.S. When K.E.S. was present, Cynthia spoke softly and generally about the domestic violence and did her best not to talk about Edward in front of K.E.S. When Dr. Geiger was seeing Cynthia, Dr. Geiger had no concerns about her fitness or her psychological ability to parent K.E.S.

¶ 31    In 2013, Edward was ordered to engage in reunification therapy through Dr. Geiger's office before he could restart contact with K.E.S. The judge overseeing the dissolution selected Dr. Geiger's office for such therapy because the therapists were familiar with the family history. Edward never met with anyone at the office, however. Dr. Geiger knew that Edward had lodged a complaint that Cynthia's primary therapist, Pearson, had given her improper legal advice. The complaint was investigated and found to be unfounded.

¶ 32    Kimberly McKenzie had served as the guardian *ad litem* for K.E.S. during the dissolution proceedings. She testified that Judge Joseph Bruce's decision regarding custody and visitation for K.E.S. had followed four days of hearings at which almost a dozen witnesses had testified. Her report to the court in that case was admitted into evidence at the dispositional hearing. She had recommended that Cynthia have sole custody of K.E.S. and that Edward have supervised

visits. Judge Bruce rejected the latter recommendation, taking over an hour to explain at length why he wanted Edward to participate in reunification counseling with Dr. Geiger's office before having any contact with K.E.S. His decision was summarized in an order entered in March 2013. That order was admitted into evidence.

¶ 33　　Cynthia testified that she had a high school diploma and had completed some community college courses. Over a 10-year period ending in 2008, she worked at a local Catholic bookstore, starting as a receptionist and working her way up to running the operation. She was not working now. She had complied with all requests by DCFS and was taking her medication and going to therapy and domestic violence counseling. She testified that the car accident occurred during a mental break when she was off her medication. She was now taking different medications that were working well: Trileptal, a mood stabilizer; prazosin, for nightmares; and Seroquel, to help her sleep. She would not go off medication again because her current medications were working better and she now had a better understanding of the symptoms that she needed to watch for. She was attending therapy every two weeks, addressing the car accident and the domestic violence, and she was willing to continue the therapy as long as necessary. Ganus was no longer assisting her because she had gotten stronger and could better care for herself.

¶ 34　　Regarding the truancy problem in 2016, K.E.S. had absences from school because of illness and trips to Madison, Wisconsin, to see her doctor. Cynthia recognized that K.E.S.'s foster mother was important to her and she promised that if K.E.S. were to be returned to her she would be willing for that to happen in a slow process that allowed K.E.S. to continue to see her foster mother. Cynthia would also follow any court orders to facilitate a relationship between K.E.S. and Edward.

¶ 35　　Dr. Klemm, K.E.S.'s therapist, testified that his focus at the beginning was on the trauma of K.E.S. being removed from her home and on her adjustment to foster care. More recently, the focus had shifted to reunification with Edward. He was told by DCFS to commence monitored telephone conversations between Edward and K.E.S. K.E.S.'s reaction to the phone call when Edward said that she would be coming to live with him was "sheer panic." He told Goodman about Edward's statement and K.E.S.'s reaction, and at the request of DCFS, he wrote the court a letter describing the incident. He also later spoke to Edward about it, and Edward apologized to him for causing K.E.S. such anxiety. Dr. Klemm did not recall whether Edward ever apologized to K.E.S. about it, either on the phone or in person.

¶ 36　　K.E.S. had now had a total of three in-person meetings with Edward at Dr. Klemm's office. The first one had been very short, about 30 seconds. K.E.S. was more animated and relaxed during the second one and was withdrawn and seemed frustrated during the third one. She had not spent more than 30 minutes total with Edward in those three meetings. The meetings were proceeding at Dr. Klemm's discretion. Dr. Klemm opined that K.E.S. had not fully worked through the trauma and strong negative emotions related to her father.

¶ 37　　Dr. Klemm had never met or spoken with Cynthia. K.E.S. mentioned Cynthia frequently during their sessions. K.E.S. told him that she liked visiting with her mother and would prefer to live with her.

¶ 38　　Dr. Klemm did not believe that K.E.S. was ready to live with either parent. He viewed her relationship with her foster mother as close and "really positive," and he was concerned about taking that away from her. He recommended that any return home occur through a transitional period instead of abruptly. He also opined that it would benefit K.E.S. for both parents to

engage in individual counseling as part of the reunification process. On cross-examination, Dr. Klemm acknowledged that K.E.S.'s foster mother had called him after the most recent face-to-face session involving Edward. She told Dr. Klemm that she had seen Edward driving in her neighborhood. Her neighborhood was a few miles away from the location of the therapy.

¶ 39 Edward testified regarding his trucking work and home life with Isler, her children, and their son. He maintained that Cynthia had lied when she accused him of abuse, and he asserted that he had never been convicted of domestic battery or violating an order of protection. He had had some of the accusations expunged. Edward was aware of the conditions placed on his ability to see K.E.S. by the 2013 custody order. After he was unable to afford the designated counseling, he decided to simply comply with the no-contact order, confident that Cynthia would again experience mental problems that would bring her to the attention of the court. In 2016, Cynthia contacted him about the truancy case, and then a few weeks later this juvenile case was opened.

¶ 40 Isler testified about her relationship with Edward and their home together. In September 2016, she accompanied Edward to the courthouse when he filed a petition in the dissolution case. The petition sought a change in custody after Cynthia was charged with permitting K.E.S.'s truancy. In January 2017, Isler also accompanied Edward to the initial counseling session recommended by DCFS. They left after they were told that Isler could not participate in the session.

¶ 41 At the close of the dispositional hearing, the parties presented closing arguments. The State, CASA, and DCFS asked that both parents be found unfit, arguing that Cynthia had not made sufficient progress in her therapy and that Edward had had almost no contact with K.E.S. for eight years and had essentially been found unfit in the 2013 custody order, which barred him from contact with K.E.S. unless he participated in counseling. Cynthia argued that she should be found fit and asked that K.E.S. be returned, but on a gradual schedule that allowed for continued involvement with the foster mother. She argued that Edward was abusive and was not a fit parent. Edward argued that Cynthia was mentally ill, that her claims of domestic violence had never been substantiated, and that he was a fit parent. The trial court took the matter under advisement.

¶ 42 On September 26, 2017, Cynthia filed a motion for unsupervised visits.

¶ 43 On October 12, 2017, the trial court announced its ruling and entered a dispositional order. In its oral ruling, the trial court found that it was in the best interest of K.E.S. to make her a ward of the court. The trial court found Cynthia unfit, stating that she "suffers from severe mental health issues" and that, although she had made "evident" progress, it was "not necessarily specifically yet [*sic*] for the return home of the minor." The trial court also found Edward unfit despite the fact that there was no finding of neglect by him, noting the restriction on visitation entered by Judge Bruce in 2013 after a four-day hearing. The trial court commented that that restriction rested on findings that Edward had engaged in domestic abuse. The trial court stated that "very little has changed between that time when that order was entered in 2013 and today," noting that, although Edward was now engaged in reunification counseling, he had not cooperated fully with recommended services. The trial court then placed the guardianship and custody of K.E.S. with DCFS, with the goal of returning home within 12 months.

¶ 44 The written order entered on the same date contained additional statements. As to Cynthia's fitness, the order stated that, "[a]lthough progress has been made by the mother in

dealing with her mental health issues, her current severe mental health issues prohibit her from properly caring for the child at this time." As to Edward's fitness, the written order reiterated the trial court's oral statements and included a finding that, as reported in the orders entered in the dissolution proceedings, "there was domestic violence on the part of the father while the mother was holding the child."

¶ 45    The trial court also ordered that visits continue to be supervised. Cynthia (whose regular attorney was not present) asked that the motion for unsupervised visits be heard, but the State objected on the ground that the case was set only for status, not a hearing on the motion. DCFS reiterated that it supported unsupervised daytime visits, but the trial court declined to rule on the motion. It continued the motion for status at the next hearing, which was to be the December 5, 2017, permanency hearing.

¶ 46    On November 6, 2017, Cynthia filed a notice of appeal. Her appeal was docketed as No. 2-17-0907. Edward filed a motion for reconsideration. It was denied on December 12, 2017, and he filed an appeal (docketed as No. 2-18-0005) a few days later. We consolidated the two appeals.[1]

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, Cynthia challenges all aspects of the October 12, 2017, dispositional order that affect her rights. Edward specifically challenges the finding that he was unfit. For ease of discussion, we address Edward's appeal first.

¶ 49    The initial phases of neglect or abuse proceedings are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2016)). If a child has been found to be neglected, abused, or dependent, the trial court must hold a dispositional hearing within six months of the child's removal from the home. *Id.* § 2-22(4). At the hearing, the court must determine whether it is in the best interests of the child and the public that the child be made a ward of the court and, if so, the disposition that will best serve "the health, safety and interests of the minor and the public." *Id.* § 2-22(1). Once a child has been made a ward of the court, the trial court may enter any of four types of dispositional orders. *Id.* § 2-23(1)(a). For a child such as K.E.S., who is already in the temporary custody of DCFS and who is not eligible for partial or complete emancipation, the only two remaining options are (1) restoring the child to the custody of a parent or guardian and (2) granting custody and guardianship of the child to DCFS pursuant to section 2-27 of the Act. *Id.* A court may not restore parental custody of a child who has been adjudicated neglected or abused unless the court determines, after a hearing, that the parent is fit to care for the minor. *Id.*

¶ 50    Section 2-27 of the Act sheds some light on the meaning of fitness in this context. Under that section, a court can grant DCFS custody and guardianship of a neglected or abused child only if it determines that the parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor[,] or are

---

[1]Illinois Supreme Court Rule 311(a)(5) (eff. Mar. 8, 2016) requires a reviewing court to issue its decision in a neglect or abuse case within 150 days after the notice of appeal was filed. Under that rule, our decision in Cynthia's appeal was due by April 5, 2018, while our decision in Edward's appeal was due by May 28, 2018. The consolidation of the appeals caused some delay. As a result, this decision is being issued shortly after the 150-day period for Cynthia's appeal expired but within the deadline for Edward's appeal.

unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *Id.* § 2-27(1).

¶ 51 At the dispositional phase, the State bears the burden of proving unfitness by a preponderance of the evidence.[2] *In re A.T.*, 2015 IL App (3d) 140372, ¶ 13. We will not reverse a trial court's finding of unfitness, unless it is against the manifest weight of the evidence, because the trial court had a superior opportunity to view and evaluate the parties. *In re M.I.*, 2016 IL 120232, ¶ 20. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.*

¶ 52                                A. Appeal No. 2-18-0005 (Edward's Appeal)

¶ 53 Edward argues that the State did not prove that he was "unfit or *** unable, for some reason other than financial circumstances alone," to care for K.E.S. He argues that the trial court's basis for finding him unfit was his failure to pursue reunification counseling after the 2013 custody order, but that he was unable to do so for purely financial reasons. We disagree.

¶ 54 In its dispositional order, the trial court found Edward unfit "based upon the totality of the evidence, including People's Exhibit #10." That exhibit contained various documents from the dissolution proceedings, including the 2013 custody order in which Judge Bruce found that restricted visitation between Edward and K.E.S. was "necessary for the physical, emotional and mental well being of the child in order to protect her from danger." The trial court also specifically referred to the findings made by Judge Bruce "in the *** divorce and order of protection cases that restricted any visitation between [Edward and K.E.S.]," and it found that "there was domestic violence on the part of the father while the mother was holding the child." In short, it is clear that the trial court's finding of unfitness was based in large part on Edward's record of domestic violence, which the trial court (like Judge Bruce) found to jeopardize the health and safety of K.E.S.

¶ 55 The trial court also noted that Edward had "failed to fully participate in [the] reunification process," with the result that "at least from March 2013 until February 2017 there was no child/parent relationship." Edward points out that, under the order of protection, he was barred from having any contact with K.E.S. except through counseling through Dr. Geiger's office. He further points to his own testimony that he could not afford the fees charged by Dr. Geiger's office. Edward argues that the trial court improperly penalized him for his financial inability to obtain the ordered counseling and that the State did not prove that he was unfit or unable to care for K.E.S. for other than financial reasons alone.

¶ 56 We reject this argument. In our view, the trial court's finding that "very little has changed *** since that March 2013 order" and its references to Edward's failure to participate in "the reunification process" express the trial court's concern that Edward had failed to address Judge Bruce's finding that contact with him would endanger K.E.S. unless he obtained therapy. It is uncontested that Edward did not obtain such therapy. Even if he could not afford reunification

---

[2]If the State later files a petition to terminate parental rights, it must meet a higher burden of proof, presenting clear and convincing evidence of unfitness pursuant to section 1 of the Adoption Act (750 ILCS 50/1 (West 2016)). See *In re Lakita B.*, 297 Ill. App. 3d 985, 993-94 (1998) (explaining the State's different burdens of proof at different stages of neglect or abuse proceedings). Thus, a finding of unfitness at the dispositional phase does not automatically translate into a finding of unfitness at the termination phase.

- 10 -

counseling with Dr. Geiger's office, Edward could have obtained other individual or domestic violence counseling, but he did not. He took no steps to remedy Judge Bruce's determination that he posed a danger to K.E.S. Instead, he adopted the approach of denying that any danger existed and waiting for some emotional breakdown by Cynthia to give him an opening for renewed contact with K.E.S.

¶ 57 After the juvenile court case commenced, Edward participated in some reunification efforts through telephone and in-person visits with K.E.S. in Dr. Klemm's office, but he refused to comply with other DCFS recommendations and referrals, including a mental health assessment, individual counseling, and a home safety check. Despite the lifting of the order of protection, there was ample evidence supporting the trial court's determination that he had not addressed the dangers posed by his history of domestic violence. This evidence, rather than Edward's purported inability to afford counseling with Dr. Geiger, was the basis for the finding of unfitness. As Edward has not shown that finding of unfitness was against the manifest weight of the evidence, we affirm the finding of unfitness.

¶ 58                               B. Appeal No. 2-17-0907 (Cynthia's Appeal)

¶ 59 Cynthia challenges every aspect of the October 12, 2017, order, including (1) the trial court's determination that K.E.S. should be made a ward of the court, (2) its finding that Cynthia was unfit to care for K.E.S., (3) its grant of custody and guardianship to DCFS, and (4) its failure to grant her at least some unsupervised visitation. We consider each assertion in turn.

¶ 60 Cynthia first argues that the trial court's determination that K.E.S. should be made a ward of the court was against the manifest weight of the evidence. We disagree. A petition for wardship is a two-step process. *In re Alexis H.*, 401 Ill. App. 3d 543, 551 (2010). First, the court must determine whether a child has been neglected or abused. If an adjudication of neglect or abuse is made, the court must go on to determine, at a dispositional hearing, whether it is in the child's best interest to be made a ward of the court. *Id.* A court may not enter a dispositional order with respect to a neglected or abused child unless the child is first made a ward of the court. 705 ILCS 405/2-23(1)(a) (West 2016). By making a child a ward of the court, a court can, among other things, keep the case open, oversee the provision of services, and enter any protective orders necessary. *Id.* § 2-23(3).

¶ 61 Here, Cynthia stipulated that K.E.S. was neglected, in that Cynthia's mental health conditions prevented her from properly caring for K.E.S. at the time the State first filed its petition for a finding of neglect. Thus, there was a basis for the threshold adjudication of neglect. A trial court may consider past events in determining the best interest of the child. *In re April C.*, 326 Ill. App. 3d 245, 261 (2001). Further, the broad language of section 2-22(1), which permits the court to consider all evidence that is helpful, including incompetent evidence, evinces the legislature's intent to give the court "wide latitude" in determining the best interest of the child during a wardship proceeding. *Id.*; see 705 ILCS 405/2-22(1) (West 2016). Indeed, although the adjudication of neglect or abuse and the wardship determination are two separate steps, we have found no reported case in which a child was adjudicated neglected and yet wardship was *not* granted. Cynthia's argument on this point is relatively broad; she focuses more on her other arguments regarding fitness, custody, and guardianship. She has not shown that it was against the manifest weight of the evidence for the trial court to make K.E.S. a ward of the court.

¶ 62 Cynthia's argument regarding the trial court's finding of unfitness is on firmer ground. Our supreme court has held that, although the best interest of the child is the overarching concern at a dispositional hearing, the Act reflects the constitutional presumption that the child's interest will best be served in the custody of a fit parent. *In re M.M.*, 2016 IL 119932, ¶ 26 (citing *Troxler v. Granville*, 530 U.S. 57, 68 (2000)). The purpose of the Act is

> "to secure for each minor *** such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; [and] to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2 (West 2016).

Thus, the " 'preferred result under the [Act] is that a child remain in his or her home, in the custody of his or her parents,' " if those parents are fit to care for the child. *M.M.*, 2016 IL 119932, ¶ 23 (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)).

¶ 63 As noted above, the State bears the burden of proving, by a preponderance of the evidence, that the child's parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor[,] or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2016). Here, the State simply did not meet that burden.

¶ 64 None of the evidence regarding Cynthia's condition at the time of the dispositional hearing demonstrated that she was unable to care for K.E.S., or that K.E.S.'s health or safety would be jeopardized if she were in Cynthia's custody. The evidence was uncontradicted that Cynthia had diligently complied with all aspects of her service plan and had corrected all of the conditions that caused K.E.S. to be removed from her care. The DCFS caseworker and CASA attested that Cynthia had secured a stable home that was warm, well-stocked, and safe for K.E.S. In fact, the visits between Cynthia and K.E.S. occurred in that home. There was no evidence that any concern regarding truancy remained. Cynthia had completed all parenting classes and other services that DCFS had recommended.

¶ 65 Further, as to Cynthia's mental health—the primary reason that K.E.S. came into the State's care—the evidence showed that Cynthia sought out treatment and medication, was diligent about continuing with both, and had made good progress. Her therapist testified that she had no concerns about Cynthia's ability to parent K.E.S. and that so long as Cynthia continued with her therapy and medication there was no danger to K.E.S. Dr. Klemm recommended that K.E.S. remain with her foster mother, but that recommendation was based solely on the good relationship between K.E.S. and her foster mother. Dr. Klemm acknowledged that he had never interacted with Cynthia and had no opinion of her fitness, and K.E.S. loved Cynthia and expressed the desire to return to her. The DCFS caseworker and CASA documented appropriate interactions between Cynthia and K.E.S. during their visits, to the point that DCFS recommended unsupervised visitation. Ganus testified that Cynthia's behavior that had worried him during the winter had been fully resolved and that he viewed her as 100% better. In her own testimony, Cynthia acknowledged the importance of continuing with therapy and medication, and committed herself to that. She also demonstrated an awareness of K.E.S.'s emotional and mental needs, recognizing that K.E.S. had become close with the foster mother and pledging to allow continued contact with the foster mother.

¶ 66    All of this evidence pointed to the conclusion that Cynthia was fit to have the care and custody of K.E.S. By contrast, there was no evidence that Cynthia's current mental condition posed a danger to K.E.S. Thus, the trial court's finding that Cynthia's "current severe mental health issues" prevented her "from properly caring for the child at this time"—its basis for finding her unfit—was against the manifest weight of the evidence.

¶ 67    The State argues that, even if the evidence suggested that Cynthia was fit at the time of the dispositional hearing, there was evidence that Cynthia's mental condition in the past presented a danger to K.E.S. The State first points to the events that brought K.E.S. into its care: the car accident and Cynthia's subsequent hospitalization for three weeks in December 2016. Further, in her efforts to obtain a prompt evaluation and medication, Cynthia was hospitalized for about a week in March 2017. Of course, a trial court may consider past events. But the events that brought a child into the State's care cannot be the primary focus of the dispositional hearing months later. If they were, parents could never regain custody of their children because the same situation exists in any neglect or abuse case. There is always a safety concern at the start of the case; that is why the child was removed to begin with. Under the Act, the State must show that the safety concern continues and rises to the level that "the health, safety, and best interest of the minor will be jeopardized if the minor remains in [or is returned to] the custody of his or her parents." *Id.* The evidence here did not demonstrate that this standard was met.

¶ 68    The State also points to evidence from further back in Cynthia's past: the intact-family case that was opened in 2008 and the indications of Cynthia's mental instability during that time, including a suicide attempt. This evidence, like the evidence regarding conditions at the start of the case, could be considered by the trial court. However, being more remote in time, this evidence was also less probative of Cynthia's current fitness to care for her child. We also note that, even then, DCFS evidently did not view Cynthia as a threat to the well-being of K.E.S., as it left K.E.S. in her care and closed the case after one year. In addition, Cynthia's psychiatrist from that time, Dr. Geiger, testified that she had had no concerns about Cynthia's ability to safely parent K.E.S.

¶ 69    Further, the trial court itself did not base its finding of unfitness on Cynthia's history. Rather, it cited "current severe mental health issues." There was no evidence that Cynthia currently had any such "severe mental health issues." Accordingly, its finding of unfitness was against the manifest weight of the evidence.

¶ 70    It is clear that the trial court was worried about whether Cynthia would remain on her medication and in therapy. This was a natural and appropriate concern. However, the same concern could be raised with respect to any parent who suffers from mental illness. Mental illness does not, by itself, render a parent unfit. See *R.C.*, 195 Ill. 2d at 305 (under the Adoption Act, mental illness alone does not allow a finding of unfitness; there must also be proof that the parent's mental condition renders her unable to discharge her parental responsibilities and that the inability will continue beyond a reasonable time); *A.T.*, 2015 IL App (3d) 140372, ¶ 16 (a diagnostic label such as "depression" is not, standing alone, a reliable indicator of a parent's "level of functionality" and "a diagnosis of depression, anxiety, a personality disorder or even schizophrenia does not automatically render a parent unfit"). Here, there was no indication that Cynthia was in any particular danger of going off her medication or that her mental condition was likely to worsen. The mere possibility that this could happen is not a sufficient basis for a finding of unfitness.

¶ 71 Further, as K.E.S. was appropriately made a ward of the court, any worries that the trial court had could have been addressed through a variety of means apart from a finding of unfitness. For instance, although custody of a child cannot be granted to a third party where the parent is fit (*M.M.*, 2016 IL 119932, ¶ 21), a court can continue to oversee the care of the child and the provision of services to the parent by granting guardianship to DCFS. See *In re M.P.*, 408 Ill. App. 3d 1070, 1074 (2011) ("section 1-3 of the Act contemplates that a trial court may divide guardianship and custody of a minor"); *In re E.L.*, 353 Ill. App. 3d 894, 898 (2004) (under section 2-27 of the Act, DCFS may be granted guardianship of the child even where a parent has custody). We do not mean to suggest that this is the appropriate outcome here. We merely point out that the desire to continue to monitor the parent-child relationship does not, by itself, justify finding an otherwise fit parent to be unfit.

¶ 72 For all of these reasons, we reverse the trial court's finding that Cynthia was unfit and remand the case for further consideration of an appropriate disposition. In light of our holding, we need not consider Cynthia's further arguments. However, we note for the record our dismay at the length of time that passed before the trial court resolved the request that Cynthia be permitted unsupervised visits with K.E.S. DCFS first recommended allowing such unsupervised visits in its May 2017 report. It repeated that recommendation in July at the dispositional hearing, and CASA stated that it had no objection to unsupervised visits. Cynthia formally moved for such visits in September. Nevertheless, the trial court did not grant such visits until mid-December. Regular visits are essential to maintaining and strengthening the parent-child relationship, and thus such visits should be as frequent, long, and unmonitored as is consistent with the child's safety and parental and agency resources. Where, as here, the agencies charged with the child's safety and well-being recommend unsupervised or increased visits, it is incumbent on the trial court to rule promptly on that recommendation.

¶ 73 III. CONCLUSION

¶ 74 The October 12, 2017, dispositional order of the circuit court of Ogle County is affirmed as to the determination making K.E.S. a ward of the court, affirmed as to the finding that Edward was unfit, reversed as to the finding that Cynthia was unfit, and remanded for further proceedings.

¶ 75 Affirmed in part and reversed in part.

¶ 76 Cause remanded.

¶ 77 PRESIDING JUSTICE HUDSON, specially concurring:

¶ 78 I am compelled to concur in the majority's decision that the trial court's finding of Cynthia's unfitness was against the manifest weight of the evidence. As noted by the majority, mental illness does not, by itself, render a parent unfit. See *R.C.*, 195 Ill. 2d at 305; *A.T.*, 2015 IL App (3d) 140372, ¶ 16. The evidence presented at the dispositional hearing did not establish that Cynthia's current mental condition rendered her unable to discharge her parental responsibilities.

¶ 79 I write separately, however, to emphasize the paramount concern in this case—K.E.S.'s health and safety. The trial court was apprehensive about Cynthia's continued adherence to her medication and therapy. Cynthia, too, sought caution by arguing at the dispositional hearing

that K.E.S. should be returned to her custody but on a gradual schedule that allowed for continued involvement with the foster mother. There are means to address this concern. As noted by the majority, the trial court may appropriately consider the option of granting *custody* to Cynthia and *guardianship* to DCFS. See *M.P.*, 408 Ill. App. 3d at 1074; *E.L.*, 353 Ill. App. 3d at 898. Additionally, the trial court may require all necessary supervision and services to be in place before returning custody to Cynthia. This approach would allow for continued supervision of K.E.S.'s care while ultimately returning K.E.S. to her mother's custody—an approach that would perhaps address the reservations of both the trial court and Cynthia herself.