2026 IL App (1st) 251452-U

FIRST DISTRICT,
SIXTH DIVISION
January 12, 2026

No. 1-25-1452

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* L.B. Jr., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois |
| (The People of the State of Illinois, | ) | Juvenile Justice and |
| | ) | Child Protection Department, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | No. 24 JA 325 |
| | ) | |
| L.B. Sr., | ) | Honorable |
| | ) | Pamela Saindon, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Trial court's dispositional order is reversed and remanded as against the manifest weight of the evidence.

¶ 2     The State filed a petition for adjudication of wardship of minor L.B. Jr. based on allegations of domestic violence related to his father, respondent L.B. Sr., and that his mother Jennifer forced his half-siblings to steal from retail stores while he was in the car. Following a dispositional hearing on July 23, 2025, the trial court adjudged L.B. Jr. a ward of the court, found

L.B. Sr. and Jennifer unable to care for, protect, train, or discipline L.B. Jr., and placed him under the guardianship of the Department of Children and Family Services (DCFS) with the right of placement. Only L.B. Sr. appeals the dispositional order, arguing it is against the manifest weight of the evidence. For the following reasons, we reverse and remand for a new disposition.

¶ 3                                    I. BACKGROUND

¶ 4         L.B. Sr. and Jennifer have one child together, L.B. Jr., born on February 23, 2023. L.B. Jr. has two older half-siblings, J.A. and M.A., by a different father. Leading up to DCFS's involvement, L.B. Sr. and Jennifer lived together with all three minors.

¶ 5         On April 12, 2024, Jennifer was arrested and charged with retail theft. On April 26, 2024, the State filed a petition for adjudication of wardship and motion for temporary custody of all three minors, alleging neglect from not receiving necessary support for their well-being, neglect due to an injurious environment, and abuse due to substantial risk of physical injury. 705 ILCS 405/2-3(1)(a)-(b), (2)(ii) (West 2024). The State alleged Jennifer, who was in jail, had two prior indicated reports for substantial risk of physical injury and environment injurious to health and welfare. Also, J.A. and M.A. reported that L.B. Sr. "makes [Jennifer] and the children shoplift from stores" and that he physically harmed them and Jennifer. The trial court granted temporary custody of the minors to DCFS with the right of placement. L.B. Jr. was placed with Lynne, his fictive kin. M.A. and J.A. were placed with a paternal aunt.

¶ 6         On January 21, 2025, L.B. Sr. moved for unsupervised visits with L.B. Jr. At a January 22, 2025, hearing on the motion, Lynne testified that L.B. Sr. sees his son at church every Sunday and three or four times during the week and that visits are safe and appropriate. Lakeside Community Committee (Lakeside) caseworker Angel Grant testified she was assigned to the case in September 2024 and referred L.B. Sr. to parenting classes, domestic violence classes, and

individual therapy. He completed parenting classes, was making progress in domestic violence classes, and had not yet started individual therapy. Grant did not formally observe any visits, but from the "snippets" she saw, L.B. Sr.'s conduct seemed safe and appropriate. Although Grant recommended unsupervised visits in the community, the trial court denied L.B. Sr.'s motion for unsupervised visits based on a domestic violence incident between L.B. Sr. and Jennifer in December 2024, and the lack of observation of visits by DCFS.

¶ 7    The court held an adjudication hearing on April 29, 2025. The parties stipulated that Jennifer was arrested and charged with retail theft in April 2024, while L.B. Jr. was in the car and the older children were with her. She pled guilty in August 2024. There were no stipulations that L.B. Sr. was involved in the thefts or forced the children or Jennifer to steal. The parties stipulated to two facts related to domestic violence: (1) DCFS Investigator Rebecca Muraski observed "holes" in the kitchen cabinets and the master bedroom door, which J.A. said were "from arguments" between Jennifer and L.B. Sr. and (2) L.B. Sr. was ruled out as a potential placement for the minors due to a "need to further explore allegations and reports of domestic disturbances in the home."

¶ 8    The trial court adjudicated all three minors abused and neglected on the grounds that forcing the children to steal showed a "disregard of a parental duty," put the minors in harm's way, and had a substantial risk of impairing their emotional health. Counsel for L.B. Sr. asked if the trial court was "making any findings about whether [L.B. Sr.] was the perpetrator or not of any of the abuse or neglect counts," to which the court responded it was "not going to make that finding at this time." Such a finding was unnecessary at the adjudication stage. See *In re Arthur H.*, 212 Ill. 2d 414, 465 (2004).

¶ 9        In May 2025, L.B. Sr. filed another motion for unsupervised visits. At the June 9, 2025 hearing, Lakeside caseworker LaDonna Powell testified that she managed the case from its start until September 2024 and was reassigned the case in May 2025. She had not met with L.B. Sr. since her reassignment, observed any visits, or known his residence. She nevertheless recommended unsupervised day visits based on the prior caseworker's reports that visits were safe and progressing well and that there "were no concerns."

¶ 10        L.B. Sr. testified that he works at Jewel Osco and lives with his sister and cousin. He visits his son every Sunday and two to three times during the week, helps Lynne around the house, plays with L.B. Jr., takes him to church, feeds, changes, reads to him, and teaches everyday skills. L.B. Sr. stated that following the domestic incident in December 2024, he and Jennifer ended their relationship. He said the domestic case was dismissed, and the order of protection against him was terminated.

¶ 11        The trial court reviewed documents showing L.B. Sr.'s progress in parenting, domestic violence classes, and individual therapy from February 1 to April 26, 2025. The report dated May 1, 2025, highlighted two therapy goals: dealing with separation issues due to DCFS involvement and understanding how this background affects him and his son. L.B. Sr. admitted to hitting Jennifer after discovering her lies and theft and acknowledged past verbal conflicts. The therapist recommended 12 additional therapy sessions, expecting goal completion by July 30, 2025, which was a month away at the time of the hearing.

¶ 12        The trial court granted DCFS discretion to allow unsupervised day visits in the community, but only after observing four supervised visits. The court also ordered it to conduct a Child Endangerment Risk Assessment Protocol (CERAP) of L.B. Sr.'s home, so the visits could eventually progress to unsupervised visits in the home.

¶ 13    A month later, on July 23, 2025, the court held a dispositional hearing. Powell testified that L.B. Sr. completed domestic violence and parenting classes and was in individual therapy. Though Powell had not spoken to L.B. Sr.'s therapist, she received a report showing consistent attendance and progress by L.B. Sr. The therapist recommended ongoing services. Powell did not specify these services, and no additional referrals were mentioned. When asked about any outstanding issues for reunification, Powell replied that none were known to her.

¶ 14    As of July 2025, L.B. Sr. was still living with his cousin and working at Jewel Osco. He visited his son weekly, but Powell only observed one visit on July 10 and did not conduct a CERAP due to medical leave and workload. No concerns were noted. Powell recommended L.B. Jr. be made a ward of the court and DCFS appointed as his guardian while reunification efforts continued with L.B. Sr. and Jennifer.

¶ 15    The trial court took judicial notice of the stipulations from the adjudication hearing, exhibits from the June 9 unsupervised visits hearing, and admitted a July 23, 2025, Permanency Hearing Report without objection from L.B. Sr. The report documents DCFS's initial investigation, mentioning allegations that Jennifer, J.A., and M.A. were physically abused by L.B. Sr., who also allegedly forced them to steal. It notes Jennifer and L.B. Sr. had extensive criminal histories and DCFS involvement but does not provide details. The report finds L.B. Sr. has shown consistent parenting skills during supervised visits, engages in age-appropriate activities, maintains healthy boundaries, responds thoughtfully to L.B. Jr.'s emotional and behavioral needs, and has made satisfactory progress and efforts. A 12-month goal for L.B. Jr.'s return home was recommended to allow L.B. Sr. to "fully address the conditions that brought the family to DCFS" and to allow for "[o]ngoing monitoring and support."

¶ 16  In seeking placement, the State and guardian ad litem requested a finding that L.B. Sr. was unable (excluding financial reasons) to care for, protect, train, or discipline L.B. Jr. since L.B. Sr.'s services were ongoing and visits were still supervised. L.B. Sr. objected, saying he did not need any additional services and the only thing preventing him from having unsupervised visits was DCFS's delay.

¶ 17  The trial court adjudged L.B. Jr. a ward of the court and found L.B. Sr. unable (excluding financial reasons) to care for, protect, train, or discipline L.B. Jr.[1] Relying on the Permanency Hearing Report, the court noted that the case came in "due to some ongoing violence" and reports that J.A. and M.A. were "physically abused" by L.B. Sr., who would "force them to steal." L.B. Sr. had been "diligent with his services, he's completed domestic violence, he's also done the parent education; however, he is still at the point where he has not had unsupervised visits." The court found L.B. Sr. "unable at this time because of the reasons why the case came [in], and more services will be needed in order to address those conditions as to why the case came in." Based on these findings, the trial court granted guardianship of L.B. Jr. to DCFS with the right to place him.

¶ 18  The trial court entered a permanency goal of return home within 12 months (roughly July 2026), finding reunification could not be immediately achieved because services were ongoing. The court ordered DCFS to conduct a CERAP of L.B. Sr.'s home within 48 hours and observe three visits within 21 days for unsupervised visits to start. The record lacks further details, but L.B. Sr.'s brief indicates DCFS had not complied by September 10, 2025. L.B. Sr. appeals.

---

[1] Jennifer was arrested again on June 24, 2025, and was incarcerated at the time of the dispositional hearing. She was found unable (excluding financial reasons) to care for, protect, train, or discipline all three minors.

¶ 19                                    II. ANALYSIS

¶ 20          "A proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 18. The "paramount consideration" in such a proceeding is the best interest of the child. *Id.*

¶ 21          In determining if a minor should be made a ward of the court, the Juvenile Court Act (Act) (705 ILCS 405/2 *et seq*) (West 2024)) mandates a two-step process. The first step is the adjudication hearing, where the trial court determines whether the minor is abused or neglected. 705 ILCS 405/2-21 (West 2024). The second step is the dispositional hearing, where the court determines "whether it is in the best interests of the minor and the public that the minor be made a ward of the court." 705 ILCS 405/2-22(1) (West 2024). If so, the court "shall determine the proper disposition best serving the health, safety, and interests of the minor and public." *Id.* Possible dispositions include: (1) continued custody with the minor's parent; (2) placed with a third party under section 2-27 of the Act; (3) restored to the custody of the parent, "provided the court shall order the parent *** to cooperate with [DCFS] and comply with the terms of an after-care plan***"; or (4) ordered partially or completely emancipated. *Id.* §2-23(1)(a).

¶ 22          After finding it was in the best interest of L.B. Jr. and the public to make L.B. Jr. a ward of the court, the court placed him with a third party under section 2-27 of the Act. Section 2-27 of the Act allows the court to make this disposition only if it determines the minor's parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so," and that the minor's health, safety, and best interest would be jeopardized if he or she remained in the custody of his or her parents. *Id.* § 2-27(1).

¶ 23    A trial court's determination regarding dispositional unfitness or inability will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 54. "A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result." *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

¶ 24    The trial court deemed L.B. Sr. unable to parent for L.B. Jr. for two reasons: the need for more services to "address those conditions as to why the case came in" and the lack of unsupervised visits. However, the record does not provide sufficient evidence to determine that L.B. Sr. was unable to care for, protect, train, or discipline L.B. Jr., necessitating placement with a third party at the time of the dispositional hearing.

¶ 25    First, although the court noted "more services" were needed, L.B. Sr. was only advised to continue individual therapy. Ongoing individual therapy should be seen generally as a positive step, not a barrier to reunification. See *In re K.E.S.*, 2018 IL App (2d) 170907, ¶ 70 (a parent's possible lapse or condition worsening does not justify a finding of unfitness).

¶ 26    The evidence at the dispositional hearing showed that L.B. Sr. is a loving father with housing and employment. He cooperates with DCFS, frequently visits his son, and has no reported concerns. He complied with all recommended services, including domestic violence classes. If domestic violence was ongoing, DCFS would have recommended more classes or related services. As it stands, no caseworker or therapist had concerns about L.B. Sr. caring for his son. Moreover, at the adjudication hearing, the parties did not stipulate to any direct acts of violence perpetuated by L.B. Sr. or that he was involved in making Jennifer or L.B. Jr.'s siblings steal. Although L.B. Sr. was initially ruled out as a placement for the minors due to a "need to

further explore allegations and reports of domestic disturbances in the home," the July 23, 2025, Permanency Hearing Report says the safety threat of domestic violence had been eliminated, underscoring L.B. Sr.'s ability to care for, protect, train, or discipline his son. See *K.E.S.*, 2018 IL App (2d) 170907, ¶ 68 (evidence from case initiation may be considered but is less probative of a parent's current fitness due to its remoteness in time); *cf. In re Kamesha J.*, 364 Ill. App. 3d 785, 796 (2006) (respondent's ongoing services supported finding she was unable to care for minor where she did not complete parenting capacity or vocational assessments and "needed more counseling to address her history of physical and sexual abuse and domestic violence").

¶ 27      Second, L.B. Sr. should not be penalized for the lack of unsupervised visits, which is controlled by DCFS. The record shows L.B. Sr. visits his son multiple times per week, allowing ample opportunities for caseworker observation so that visits could be unsupervised. While we appreciate wanting to observe and monitor L.B. Sr.'s interaction with L.B. Jr., "the desire to continue to monitor the parent-child relationship does not, by itself, justify finding an otherwise fit parent to be unfit." See *K.E.S.*, 2018 IL App (2d) 170907, ¶ 71. Nor does it provide grounds for the court to find L.B. Sr. unable to care for his son. There are alternatives to third-party placement that could address any concerns. See *e.g., In re M.P.*, 408 Ill. App. 3d 1070, 1074 (2011) ("section 1-3[(8)(c)] of the Act contemplates that a trial court may divide guardianship and custody of a minor"); *In re E.L.*, 353 Ill. App. 3d 894, 898 (2004) (same, but under section 2-27 of the Act); 705 ILCS 405/2-23(1)(a)(4) (West 2024) (even if custody is restored, the parent must still cooperate with DCFS and follow an after-care plan).

¶ 28      Though L.B. Jr. was appropriately made a ward of the court – a finding that L.B. Sr. does not challenge on appeal– the trial court's finding that L.B. Sr. was unable to care for him is against the manifest weight of the evidence, and the resulting disposition of placing him with a

third party was an abuse of discretion. As such, we reverse and remand for further proceedings and entry of an appropriate disposition. See *K.E.S.*, 2018 IL App (2d) 170907, ¶ 72 (reversing the finding that mother was unfit and remanding for further consideration of an appropriate disposition); *In re L.R.-M.*, 2025 IL App (4th) 250097-U, ¶ 30 (reversing the finding that respondent was dispositionally unfit and remanding the matter for a new dispositional hearing).

¶ 29    Given the passage of time and continued monitoring by DCFS, we are not in position to order a particular disposition. See *In re D.F.,* 2024 IL App (1st) 241566, ¶ 61 (the best interest of the minor at a dispositional hearing is not static and may require a reexamination at any time). However, we reiterate that restricting parental rights is a significant intrusion into the family, which should not be undertaken lightly. We assume that, by now, DCFS has completed a CERAP of L.B. Sr.'s home and observed more visits, permitting L.B. Sr. to have unsupervised visits without concern and to remain on track for reunification.

¶ 30    On remand, the court should prioritize this case, make an expedient and appropriate disposition, and ensure L.B. Jr.'s best interest remains the paramount consideration. See *D.F.,* 2024 IL App (1st) 241566, ¶ 64. In making such determination, the trial court should consider all possible dispositions and any changed circumstances, like whether the agency has conducted the remaining observations and CERAP of L.B Sr.'s home, whether L.B. Sr. and Jr. are engaged in unsupervised visits and how those visits are progressing, and any relevant updates on L.B. Sr.'s individual therapy.

¶ 31    III. CONCLUSION

¶ 32    The July 23, 2025, dispositional order of the circuit court is reversed as to the third-party placement of L.B. Jr. and the finding that L.B. Sr. was unable to care for, protect, train, or discipline his son, necessitating third-party placement. We remand for further proceedings and

new disposition in accordance with the Act. Considering our holding, we need not address L.B. Sr.'s other arguments.

¶ 33        Reversed and remanded.