2025 IL App (2d) 240573-U
No. 2-24-0573
Order filed January 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* T.W., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 24-JA-50 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Jessica W., | ) | Carl E. Metz, II, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err when it found the subject minor neglected and abused, ordered that she be made a ward of the court, and found respondent unfit.

¶ 2    Following adjudicatory and dispositional hearings in the circuit court of McHenry County, the trial court adjudicated the minor, T.W., as abused and neglected under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(ii), 2-3(1)(b) (West 2022)), and found that it was in the minor's best interest that she be made a ward of the court and placed in the custody and guardianship of the Department of Children and Family Services (DCFS) (*id.* § 2-27)). Respondent, Jessica W., the minor's mother, appeals from these orders. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The minor was born in 2018. Jeff C. is the minor's father. In September 2023, respondent, Jeff, and the minor lived in a house in Fox Lake with Lisa W., who was respondent's mother and also Jeff's wife. Jeff was 27 years older than respondent and had known respondent since she was 14. In April 2024, respondent, Jeff, and the minor moved to Lake in the Hills. At the time, respondent was pregnant with her and Jeff's second child together. On April 20, 2024, respondent called for an ambulance to take her to the hospital. The minor was in the sole care of respondent and was transported with respondent to the hospital. Hospital staff contacted DCFS due to a concern about respondent leaving the hospital against medical advice, with an elevated blood alcohol content, and when the minor was without adequate clothing. A few days later, respondent was investigated by the police for an alleged battery in which she attacked a teenager at a park in Lake in the Hills. DCFS found that allegations of abuse and neglect were substantiated by its investigations.

¶ 5    On May 29, 2024, the State filed an amended petition for adjudication of wardship as to the minor, alleging that she was an abused or neglected minor and that it was in her best interests to be adjudged a ward of the court. *Id.* § 2-3(1). Specifically, the State alleged that the minor was neglected due to an environment injurious to her welfare (*id.* § 2-3(1)(b)), abused due to actual injury (*id.* § 2-3(2)(i)), and abused due to substantial risk of physical injury (*id.* § 2-3(2)(ii)).

¶ 6                        A. Adjudicatory Hearing

¶ 7    At an August 22, 2024, adjudicatory hearing on the State's petition, three police officers testified as to separate incidents of being called to respondent's home in Fox Lake for reports of domestic violence. One officer testified that, on September 13, 2023, there was a physical fight between respondent and Lisa. Another officer testified that, when dispatched to the home on September 18, 2023, respondent stated that she had an argument with Jeff and that Jeff ultimately

punched her in the face and kneed her in the vagina. Jeff told the officer that respondent had kicked him. Both of them stated that the minor witnessed the dispute. A third officer testified that he was dispatched to respondent's home on September 25, 2023. Respondent told him that she and Lisa were arguing and that it became physical. Respondent said she was planning to leave the house with the minor so the officer left. About a half hour later the officer was dispatched back to the house and Lisa stated that she and respondent started another physical fight.

¶ 8    Olivia Bahl testified that she was 17 years old. On April 23, 2024, she was at a park in Lake in the Hills. She was with her twin sister (Grace), her five-year-old sister (Autumn), her boyfriend, and his two friends. They were watching Autumn play on the playground. At one point, a man, a woman, and a child exited a car near the playground. Bahl identified respondent and Jeff in court as the couple she saw at the playground. From a distance, she saw them start saying something to Grace, who was on the playground with Autumn. Bahl approached and heard respondent yelling at her sister about being too old to be at the playground. After respondent yelled for another five minutes, she grabbed Bahl by the neck and pushed her backward. Bahl, who was standing in front of a slide at the time, fell backward over it. Bahl got back up and started pushing respondent away, but respondent hit her in the head. Jeff, her sister, and one of her friends had to pull respondent off of her. Bahl further testified that there were two playgrounds at the park: a larger one and a small one. The altercation occurred on the larger playground and the child was on the smaller playground at the time. After the fight ended, respondent, Jeff, and the minor left the park. Bahl had a bump on her head and her ear was red. Later that evening, she had a seizure, although she acknowledged having a history of seizures.

¶ 9    Sergeant James Riffe testified that, on April 24, 2024, he was dispatched to a local hospital regarding a battery. At the hospital, he spoke to a nurse, Bahl, and Bahl's mother. He observed

redness and swelling around Bahl's left eye, redness on her ear, and a couple scratches on her chest. He then spoke to respondent in front of her home in Lake in the Hills. Jeff and the minor were also present. People's Exhibit 12 was admitted into evidence, which was bodycam footage of the discussion Riffe had with respondent on that day. Respondent denied being at the park on April 23rd. People's Exhibit 13 was also admitted, which was bodycam footage of a phone conversation Riffe had with respondent on April 30, 2024. During that conversation, respondent stated that she was at the park on April 23rd, where a group of teenagers was smoking weed and vaping, and exhaled smoke in the minor's face. She told them to leave the playground, and a girl came out of nowhere and starting attacking her. Respondent grabbed the minor and left the park. Riffe informed respondent that he had received a video that did not support her version of events. At trial, Riffe testified that he had received a video of the altercation from Bahl's mother. He believed that Bahl's boyfriend had taken the video, but he was not able to make contact with him.

¶ 10 Antoinette Gonzalez testified that she was a DCFS investigator and was assigned to investigate an April 21, 2024, report related to the minor that alleged a substantial risk of physical injury and inadequate clothing. Gonzalez prepared an investigative report and it was admitted into evidence. The report indicated that the minor was 5, respondent was 29, and Jeff was 57 years old. The investigation revealed that, on April 20, 2024, respondent called an ambulance to her home for preterm labor. She was naked and wrapped in a blanket. Both she and the minor were transported to the hospital. Although respondent was found not to be in labor, a drug screen was done because she was acting erratically. When respondent learned that she was being drug tested, she ripped off her fetal monitors and signed out of the hospital against medical advice. Hospital staff had to convince her to put on a pair of scrub pants and some socks before leaving. Her top was wrapped in a blanket. She then took the minor outside without a coat in 30- to 40-degree

weather and waited for two Ubers, as the first Uber driver refused to take the minor without a car seat. The results of the drug test revealed that respondent had a blood alcohol level of .293. At that time, she was 25 weeks pregnant and had received no prenatal care up to that point.

¶ 11 During the investigation, another person informed Gonzalez that respondent was seven months' pregnant and getting drunk every day. Respondent, the minor, and Jeff were splitting their time between Illinois and Missouri, typically staying in hotels known for drugs and prostitution. Respondent had been aggressive with strangers and started fights on multiple occasions. The minor was often seen running outside around the home without supervision. Respondent had previously contacted relatives to ask if they could watch the minor because she was about to start a fight with someone and might get arrested. The person also told Gonzalez that Jeff had a history of domestic violence.

¶ 12 Gonzalez testified that, after her investigation, she prepared a report that made a finding of "indicated," meaning that the evidence supported a conclusion that the child was at substantial risk of physical injury and in an environment injurious to her welfare. In the report, Gonzalez found the allegation of inadequate clothing to be indicated and concluded that the minor was unsafe because respondent and Jeff refused access to the minor and instead chose to flee with her. Gonzalez also concluded that the minor was unsafe because respondent was abusing alcohol while being the minor's sole caregiver and being pregnant, and that the minor was likely to be moderately or severely harmed in the immediate future.

¶ 13 Gonzalez testified that she also investigated an April 25, 2024, report alleging substantial risk of physical injury. She prepared a report of her investigation, which was admitted into evidence. The report indicated that the police had a video of respondent attacking a 16-year-old girl at a park on April 23, 2024, with the minor present at the park during the incident. The report

further stated that on May 29, 2024, respondent and Jeff were supposed to relinquish custody of the minor to DCFS, but fled with the minor instead. They were later located, and both respondent and Jeff were arrested, with the minor taken into protective custody. Respondent was arrested for the battery at the park and for kidnapping. In the report, Gonzalez concluded that the minor was unsafe and made a finding of "indicated," meaning there was evidence to support the allegations that prompted the investigation.

¶ 14 Gonzalez's reports also indicated that she was at the respondent's home on May 23, 2024, attempting to ask respondent about the two DCFS reports, but respondent kept saying "no comment." When Gonzalez asked to see the minor, respondent said she was at a daycare 90 minutes away. Gonzalez stepped away to call her supervisor and was instructed to inform respondent that the minor would be taken into protective custody and that respondent needed to disclose the minor's location. Jeff then told respondent to tell Gonzalez to get a warrant and to close the door. Gonzalez testified that, because respondent did not cooperate in turning over the minor to DCFS, her supervisor obtained a warrant on May 24, 2024. Gonzalez's reports also indicated that respondent brought the minor to the DCFS office on May 28, 2024, but when DCFS asked to speak with the minor alone, respondent left the building with the minor and they drove away with Jeff. Later that day, an alert was issued in the news to locate the minor.

¶ 15 Gonzalez testified that, during her investigation, she spoke to the minor's maternal grandmother (Lisa) and the minor's maternal uncle. Gonzalez acknowledged that, on April 20, 2024, no one at the hospital approached the minor to find out if she was cold, shivering, crying, or trying to go back inside. The minor was brought to the hospital in the ambulance with respondent and was likely transported in the clothes she was wearing when the ambulance arrived. Gonzalez acknowledged that respondent called a second Uber because the first one did not have a car seat.

She was unsure how long respondent and the minor were outside waiting for Ubers. Her finding of inadequate clothing was based on the outside temperature and the minor's age. Gonzalez also testified that the minor was at risk of injury because respondent was intoxicated. She acknowledged that no one at the hospital stated respondent was incoherent and that respondent was able to call two Ubers on her own.

¶ 16 Officer Andrew Gazda testified that he was employed by the Village of Lake in the Hills police department. On May 28, 2024, at 7:32 p.m., he responded to a 911 call at a local address and learned that the Woodstock police department was at that address investigating a child abduction involving respondent and Jeff. Gazda spoke with someone named Natalia through a window, but she refused to let the police enter the house. On May 29, 2024, at 1:31 a.m., a search warrant was obtained for the home. He and other officers forcefully entered the home to search for the minor. People's Exhibit 16 was Gazda's bodycam footage taken during the entry. They found respondent and the minor hiding in a closet. Gazda testified that he did not know if the minor was crying at the time, but the bodycam footage showed that the police approached the closet with guns drawn and ultimately had to forcefully drag respondent and the minor out of the closet. The minor was upset and screaming for respondent.

¶ 17 The parties stipulated to the admission of People's Exhibit 17, which was bodycam footage worn by one of the officers that responded to respondent's call for an ambulance on April 20, 2024. During that video, respondent stated that she was the sole caregiver for the minor for the past three days and that she had been having Braxton Hicks contractions during that time. The emergency responders asked the minor to get a coat, but the minor walked out the door without doing so and they did not stop her. In an admitted medical report from respondent's hospital stay on April 20, 2024, hospital personnel wrote that respondent reported having contractions for the past three days

but stated that she did not come to the hospital because her fiancé was out of state and she had no one to care for the minor. Respondent told hospital personnel that she was pregnant but had not received any prenatal care.

¶ 18    The State rested and respondent moved for a directed finding. Respondent argued that while the State provided evidence of bad behavior, it was not linked to any abuse or neglect of the minor. After argument, the trial court granted the motion with respect to section 2-3(2)(i) of the Act (*id.* § 2-3(2)(i)) because there was no evidence of actual physical injury to the minor. However, the trial court denied the motion with respect to the substantial risk of injury and an injurious environment. The trial court stated that its decision was based on the admitted exhibits and the testimony of the witnesses, all of whom the trial court found to be credible.

¶ 19    Jeff testified that he, respondent, and the minor were only at the park for five minutes on April 23, 2024. Thereafter, respondent rested.

¶ 20    Following closing arguments, the trial court found that the State proved by a preponderance of the evidence that there was a substantial risk of injury and an injurious environment. The trial court stated that the following factors created a risk of injury and an injurious environment: (1) on April 20th, respondent had a blood alcohol content of .293, was the sole caregiver for the minor for at least three days, and allowed the minor to wait outside the hospital in cold weather without a coat while she called two Ubers; (2) the minor witnessed respondent physically attacking a teenager at a park; and (3) when DCFS attempted to take protective custody of the minor, respondent fled, and the police had to obtain a warrant, ultimately finding the minor hiding in a closet. The trial court admonished respondent to cooperate with DCFS and set the matter for a dispositional hearing.

¶ 21                    B. Subsequent Reports and Information

¶ 22    A report submitted by the court appointed special advocate (CASA), filed on September 11, 2024, stated that the minor was happy in her placement with her maternal aunt and uncle. Maternal uncle reported that the minor frequently talked about court, especially since having more visits with her biological parents. Respondent reported that the minor had only completed the first half of kindergarten. Maternal aunt stated that the minor was in first grade but did not know how to read; however, the minor was able to neatly write her first and last name.

¶ 23    A Youth Services Bureau report filed on September 12, 2024, stated that respondent completed a substance abuse assessment at Rosecrance, which determined she was not in need of services. Respondent wore an ankle monitor, and at that point, the results had been negative for substances. Respondent was referred for (1) counseling due to her history of domestic violence, verbal arguments, and family dynamics, particularly as Jeff pursued respondent while he was in a relationship with respondent's mother; and (2) parenting classes. Respondent completed the intake forms, was assigned a therapist, and would soon be assigned times for parenting classes. Respondent had visits with the minor twice a week and was observed to be engaging, loving, and appropriate during those visits.

¶ 24    A DCFS integrated assessment filed on September 12, 2024, stated that respondent reported being unemployed since January and was unable to work due to her pregnancy and gestational diabetes. Respondent's criminal history showed five reported assault charges and one kidnapping charge, but no convictions. Respondent was currently on house arrest with an ankle monitor, a substance monitor, and undergoing daily drug tests. Respondent was in a relationship with Jeff, and they had been renting a home since March 2024. Prior to that, they lived with respondent's mother, Lisa. Respondent stated that she drank excessive alcohol on April 20, 2024, due to stress even though she knew she was pregnant.

¶ 25     The assessment report further indicated that the primary concerns for respondent were her substance use, emotional regulation, and poor judgment.  Respondent used substances to alleviate stress, entered into unhealthy relationships, and her emotional dysregulation placed the minor in unsafe situations.  Without intervention, respondent's global functioning would deteriorate and any child in her care would be at risk of imminent maltreatment.  The report recommended a substance abuse assessment, trauma-focused individual psychotherapy, parenting classes, and regular supervised visitation with the minor.  The report stated that the minor was traumatized by witnessing domestic violence, respondent attacking a teenager at the park, and respondent being intoxicated.  The minor was also placed at risk by being in a car without a car seat and being abducted when DCFS attempted to take protective custody.

¶ 26     A DCFS service plan, filed September 12, 2024, required respondent to comply with all recommended services—a substance abuse assessment, random drug screens, trauma-focused individual psychotherapy, and parenting classes.

¶ 27                              C. Dispositional Hearing

¶ 28     On September 19, 2024, the trial court held a dispositional hearing.  The trial court noted that it reviewed and was taking judicial notice of the CASA report, the Youth Services Bureau report, the DCFS integrated assessment, and the DCFS service plan.

¶ 29     Jamie Mowers testified for respondent, stating that she was the DCFS caseworker for the subject case.  Mowers had been in contact with respondent and had no trouble communicating with her.  She had not completed a home visit because respondent had sold her home and had not yet found a permanent residence.  Respondent and Jeff told Mowers that they planned to live with friends until they found another home.

¶ 30    Mowers further testified that, regarding the return home for the minor, there were concerns about domestic violence, mental health, and parenting. Respondent had started services for domestic violence and mental health counseling. When asked about any interactions that raised concern about domestic violence, Mowers recalled an instance in the courthouse hallway where Jeff called respondent a "psycho." Mowers also testified that respondent exhibited heightened emotions and needed to learn to manage them more appropriately.

¶ 31    Finally, Mowers testified that respondent had supervised visitation with the minor twice a week, and her interactions during those visits were appropriate. DCFS allowed additional visitation upon request. However, there were concerns about unsupervised visitation in the community due to the original abduction. The fact that respondent wore two ankle monitors, one for substance and the other for GPS tracking, did not alleviate the concern. As respondent made progress in her services, unsupervised visitation in the home and community would be considered.

¶ 32    In closing argument, respondent asserted that regarding the alcohol incident, she had undergone an assessment at Rosecrance, which determined that she did not require any treatment. She had daily alcohol screenings for months, all of which returned negative results. Regarding the incident at the park, respondent argued that the minor was never in danger and that she was now attending therapy. Respondent emphasized that she had complied with all recommended services to date and argued that this should be an "intact case," meaning the minor could be returned home while the parents remained under monitoring. She argued that it was in the minor's best interest to be returned home, noting that she no longer lived with her mother, thereby eliminating any concerns about domestic violence. Respondent stated she had no objection to keeping the case open and continuing to participate in services. Alternatively, she argued that the goal should be set for a return home in five months.

¶ 33    The guardian *ad litem* (GAL) opined that, based on the circumstances and evidence in the case, supervised visitation was appropriate. The State argued that 12-month return home goal was the most suitable option, as it would provide respondent with time to receive services and attend family therapy.

¶ 34    In issuing its ruling, the trial court first noted that the CASA report indicated that the minor never finished kindergarten, could not read, and frequently spoke about court proceedings and returning home. The trial court found it inappropriate for the minor to be inundated with information about the legal process. The trial court acknowledged the Rosecrance evaluation but questioned what information had been provided to Rosecrance, given that respondent had arrived at the hospital seven months pregnant with a blood alcohol content of .293. The court also commented on the fact that the minor knew Jeff as her grandfather until the current issues arose, after which he suddenly became her father.

¶ 35    The trial court found it reasonable for respondent to participate in substance abuse assessment and follow all recommended services, including individual psychotherapy and parenting classes. It concluded that it was in the minor's best interest to be made a ward of the court, finding that respondent was unfit due to the services yet to be completed. The trial court found that returning the minor home at this point was detrimental to her health, safety and welfare and deemed a 12-month return home goal appropriate. The trial court adjudicated the minor as neglected and abused, made her a ward of the court, granted custody to DCFS with the right to place her, and granted guardianship to DCFS. The court also expressed a desire to see increased visitation time and admonished respondent to comply with the service plans and correct the conditions that led to the minor's placement in care, or risk termination of her parental rights. This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    Respondent raises four arguments on appeal, contending that the findings of the trial court—that the minor was neglected, abused, should be made a ward of the court, and should not be returned home—are against the manifest weight of the evidence.

¶ 38    The Act provides a two-step process for an adjudication of wardship. 705 ILCS 405/1-1 *et seq.* (West 2022); *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing at which the trial court considers only whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2022); *A.P.*, 2012 IL 113875, ¶ 19. At the adjudicatory hearing, the focus is centered on whether the child is neglected, abused, or dependent, not on whether the parent caused that condition. *In re Arthur H.*, 212 Ill. 2d 441, 463-67 (2004). It is the State's burden to prove, by a preponderance of the evidence, that the allegations regarding the child's condition are more probably true than not. *Id.* at 463-64.

¶ 39    If the trial court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2022); *A.P.*, 2012 IL 113875 ¶ 21. Cases involving allegations of abuse and neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Arthur H.*, 212 Ill. 2d at 463.

¶ 40                                 A. Abuse and Neglect

¶ 41    Respondent's first contention on appeal is that the trial court's finding that the minor was neglected and abused was against the manifest weight of the evidence. A neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018); *A.P.*, 2012 IL 113875, ¶ 22. Neglect is defined as "the failure to

exercise the care that circumstances justly demand" and encompasses both willful and unintentional disregard of parental duty. *A.P.*, 2012 IL 113875, ¶ 22. "It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." *Id.* Similarly, the term "injurious environment" has been recognized as an "amorphous concept that cannot be defined with particularity," but includes the "breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Id.*

¶ 42    An abused minor under section 2-3(2)(ii) of the Act includes one whose parent or other person responsible for her welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2022). Actual injury is not required, it is sufficient if there is substantial risk of physical injury. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. "[B]y including the language 'impairment of emotional health' in the statute, the legislature has clearly signaled that emotional and mental health of children is of paramount concern and on the same level as physical injury." *In re J.R.*, 2022 IL App (1st) 221109, ¶ 60. The same allegations supporting the finding of neglect due to injurious environment can also support the finding of abuse due to substantial risk of physical injury. *Id.* ¶ 57.

¶ 43    A trial court's finding of neglect or abuse will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49. A reviewing court defers to the trial court's findings of fact

because it is in the best position to observe the testimony of the witnesses, assess their credibility, and weigh the relative evidence. *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006).

¶ 44    In the present case, the trial court's determination that the minor was neglected and abused was not against the manifest weight of the evidence. The same evidence that supports the trial court's finding of neglect due to an injurious environment also supports its finding of abuse based on a substantial risk of physical injury likely to cause impairment of emotional health. First, the evidence showed that, when respondent called for an ambulance on April 20, 2024, the minor was in her sole care while she had a blood alcohol content of .293. At the hospital, after learning she was being drug tested, respondent left against medical advice. She was unclothed, and hospital staff had to convince her to put on a pair of scrub pants and socks. Respondent then took the minor outside in 30-to-40-degree weather at midnight to wait for two Ubers. Although respondent could have told Gonzalez, during her investigation, that the Uber had a proper car seat for the minor, she never did, allowing the inference that the minor was not in a car seat.

¶ 45    Next, the evidence showed that respondent attacked a teenager at a park in front of the minor, requiring three people to pull her off the teenager. The teenager sustained injuries and suffered a seizure. Although respondent denied the attack, it was caught on video and she was charged with battery. The minor also witnessed a number of domestic disputes that involved physical altercations between respondent and Lisa, and between respondent and Jeff. Finally, when respondent learned that DCFS sought to take protective custody of the minor, she fled with the minor. This led to the police storming the house at 1 a.m. with guns drawn and dragging the minor out of a closet, upset and screaming. Given the fact-specific nature of findings of neglect and abuse, we cannot say the trial court's decision was against the manifest weight of the evidence. The foregoing evidence demonstrates that respondent subjected the minor to an injurious

environment, breached her "duty to ensure a safe and nurturing shelter" for the minor (*Arthur H.*, 212 Ill. 2d at 463), and created a substantial risk of physical injury.

¶ 46    In arguing to the contrary, respondent asserts that the video of the ambulance picking her up shows that the house was in good order, she was completely covered by a blanket, and she clearly conveyed information about her preterm labor.  Further, she notes there was no basis to stay at the hospital since her contractions had ceased and it was reasonable for her to want to take the minor home because it was so late at night.  However, even assuming all this was true, the other evidence that the minor regularly witnessed acts of violence, respondent fled with the minor requiring the police to take her into protective custody by forcefully entering the home with guns drawn, and respondent was heavily intoxicated when leaving the hospital alone with the minor and without a car seat, still supports the trial court's findings.  Moreover, even if respondent insisted on leaving the hospital, she could have remained indoors with the minor until the Ubers arrived rather than having the minor stand outside with inadequate clothing.

¶ 47    Respondent also challenges Gonzalez's credibility on the basis that she only reviewed medical records and police reports, but did not personally speak to hospital personnel, police officers, or those involved in the incident at the park.  This argument is unavailing as the trial court found Gonzalez's testimony "credible" and it was supported by the police officers' testimony and the video footage of respondent being picked up by the ambulance and of the events when the minor was taken into protective custody.  Additionally, when Gonzalez questioned respondent during her investigation to get respondent's version of events, she repeatedly responded with "no comment."

¶ 48    The cases cited by respondent are distinguishable.  First, respondent relies on *In re S.G.*, 2022 IL App (1st) 210899, ¶ 32, in which the reviewing court found that a minor was not abused

under the Act because the alleged perpetrator had moved out of the home prior to the filing of the adjudication of wardship. Respondent argues that, similarly to *S.G.*, the domestic disputes occurred while she, Jeff, and the minor were living with Lisa, but that they had since moved and no longer resided with her. Respondent's reliance on *S.G.* is unpersuasive as the evidence in this case showed that the domestic violence extended beyond respondent and Lisa; there was also violence between respondent and Jeff, and they continued to live together. Respondent also notes that the *S.G.* court held that a single instance of attempted suicide was insufficient to support the finding of abuse, where the respondent immediately regretted the attempt and called 911. *Id.* ¶ 36. Similarly, respondent contends that a single incident of being intoxicated while caring for the minor should not support the finding of abuse. However, unlike *S.G.*, the findings of abuse and neglect in this case were based on multiple factors, including intoxication, inadequate clothing, domestic and public violence, and kidnapping.

¶ 49     Respondent also relies on *In re N.B.*, 191 Ill. 2d 338, 345 (2000), in which our supreme court reviewed a finding of neglect due to an injurious environment. The finding was based on two angry outbursts by the mother in front of her children at a health department facility. *Id.* at 347-48. The *N.B.* court reversed the finding of neglect, reasoning that the outbursts were not directed at the children, who were unharmed. Additionally, a clinical social worker had observed the mother interacting with one of the children over a period of time and determined that the child was properly clothed, well taken care of, and that any frustration expressed by the mother was typical of parental interactions with a young child. *Id.* at 351.

¶ 50     Respondent argues that, similar to *N.B.*, her anger was never directed at the minor and there was no evidence that the minor lacked basic necessities, such as food, clothing, medical assistance, or a stable home. However, respondent's reliance on *N.B.* is unpersuasive as there are significant

differences between that case and the present case. In *N.B.*, the angry outbursts involved screaming, throwing things, and crying, but did not include physical violence. *Id.* at 347-48. In contrast, in the present case, there were multiple instances where the minor witnessed physical violence at home, and she also saw respondent physically assault a teenager at the park. Additionally, when DCFS attempted to take protective custody of the minor, respondent failed to cooperate and the minor had to be forcefully taken in the middle of the night by police, with guns drawn. Moreover, there was evidence that the minor was in the sole care of respondent while she was heavily intoxicated and that respondent took her outside with inadequate clothing and placed her in an Uber without a car seat.

¶ 51 Finally, respondent relies on *In re Baby Boy Butt*, 76 Ill. App. 3d 587 (1979), to argue that the trial court erred in finding that the minor was abused. In *Butt*, the reviewing court found that, even though the mother was guilty of involuntary manslaughter of a stepdaughter, her two minor biological children were not neglected. *Id.* at 594-95. In so holding, the reviewing court emphasized the unique circumstances surrounding the mistreatment of the stepdaughter, and evidence that the mother had a warm and loving relationship with her natural children. *Id.* at 594. The reviewing court further stated that the minors could not be found neglected "on the mere possibility that the child[ren] may be abused." *Id.*

¶ 52 Respondent asserts that, as in *Butt*, there was not enough evidence to show that abuse was more than a mere possibility. We disagree. In *Butt*, there was no evidence of any neglect of the natural children. The State's basis for alleging neglect was due to the mother's treatment of her stepdaughter. In contrast, in this case, the evidence showed that respondent subjected her daughter to acts of violence between respondent and others, made her wait outside in cold weather without a coat while respondent was heavily intoxicated, took her in a car without a car seat, and fled from

DCFS requiring police to take protective custody of the minor by force in the middle of the night. We hold that this evidence is sufficient for us to affirm the trial court's findings of neglect and abuse, as we cannot say the trial court should have reached the opposite result. See *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29 (noting the strong and compelling presumption in favor of the result determined by the trial court in child custody cases).

¶ 53                                    B. Wardship

¶ 54    Respondent's next contention on appeal is that the trial court's determination that the minor be made a ward of the court was against the manifest weight of the evidence. After an adjudication of neglect or abuse is made, the trial court must go on to determine, at a dispositional hearing, whether it is in the child's best interest to be made a ward of the court. *In re Alexis H.*, 401 Ill. App. 3d 543, 551 (2010). A trial court may not enter a dispositional order with respect to a neglected or abused child unless the child is first made a ward of the court. 705 ILCS 405/2-23(1)(a) (West 2022). By making a child a ward of the court, a trial court can, among other things, keep the case open, oversee the provision of services, and enter any protective orders necessary. *Id.* § 2-23(3).

¶ 55    As pointed out by the State, this argument is technically forfeited as respondent did not raise this argument before the trial court. "The principles of forfeiture apply to proceedings conducted pursuant to the Juvenile Court Act." *In re H.D.*, 343 Ill. App. 3d 483, 489 (2003). Issues not raised in the trial court are forfeited and may not be raised for the first time on appeal. *In re Ronald J.*, 2017 IL App (4th) 160855, ¶ 22. At the dispositional hearing, respondent never argued that wardship was not appropriate, respondent argued only that this should be an intact case such that custody should remain with respondent but that respondent would continue to participate in services and be monitored. Specifically, respondent argued:

"I have no objection to the case remaining open. I have no real objections to the services with regard to respondent mother as she continues to complete further into her therapy, et cetera. ***

So, based on that, Your Honor, I would ask that the minor be able to return home and we can monitor this case as an intact case, Your Honor."

¶ 56     As noted, to keep a case open and monitor services, a child must first be made a ward of the court. 705 ILCS 405/2-23(1)(a), 2-23(3) (West 2022). Thus, by arguing that the case should remain open and services monitored, respondent conceded to the minor being made a ward of the court. Even absent forfeiture, reversal would not be warranted. A trial court has wide latitude in determining the best interest of the child during a wardship proceeding. *In re K.E.S.*, 2018 IL App (2d) 170907, ¶ 61. In light of the trial court's findings of abuse and neglect, we cannot say the wardship finding was against the manifest weight of the evidence. *Id.* (noting a lack of cases in which a child was adjudicated neglected or abused and where wardship was *not* granted).

¶ 57                                C. Fitness

¶ 58     Respondent next argues that the trial court erred in finding her unfit. During a dispositional hearing, the State must prove a parent's dispositional unfitness pursuant to section 2-27 of the Act (705 ILCS 405/2-27 (West 2022). *In re K.B.*, 2012 IL App (3d) 110655, ¶ 22. Specifically, the State bears the burden of proving, by a preponderance of the evidence, that the child's parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor[,] or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2022). We will not reverse a trial court's finding of unfitness unless it is

against the manifest weight of the evidence, because the trial court had a superior opportunity to view and evaluate the parties. *In re M.I.*, 2016 IL 120232, ¶ 20.

¶ 59    In this case, DCFS caseworker Mowers testified that, regarding a return home for the minor, there were concerns about domestic violence, mental health, and parenting. The integrated assessment stated that there were concerns with respondent's substance use, emotional regulation, and poor judgment. The record supported these concerns as the minor was subjected to repeated instances of domestic violence, and also witnessed public violence at the park and erratic behavior at the hospital in April 2024. At the hospital, respondent was intoxicated while the minor was in her sole care and she took the minor outside while she and the minor had inadequate clothing. She drove away with the minor in an Uber and there was no indication that the child was in an appropriate safety seat. Further, she refused to cooperate when DCFS wanted to speak with the minor, resulting in the minor being forcefully taken into protective custody in the middle of the night. In light of these facts, we cannot say that the trial court's dispositional fitness finding was against the manifest weight of the evidence.

¶ 60    In arguing that she was fit, respondent notes that she had been appropriate during visits with the minor, Rosecrance found no treatable substance abuse issues, and she had started her services. However, the trial court questioned the validity of the Rosecrance assessment as respondent had a blood alcohol level of .293 when she was seven months pregnant. Further, merely because respondent was appropriate during supervised visitation does not necessarily mean she could be appropriate if the minor was in her unsupervised care full-time. Respondent also points out that DCFS did not investigate her home. However, the caseworker testified that she had a scheduled visit to the home but it was cancelled because respondent was moving and had not yet found a new permanent residence. Finally, respondent argues that there was no connection

between the recommended services or a showing that such services were needed. We disagree. The evidence presented supported the conclusion that respondent was in need of a substance abuse assessment, parenting classes, and psychotherapy.

¶ 61    Respondent relies extensively on *K.E.S.*, 2018 IL App (2d) 170907, in arguing that she was not unfit. *K.E.S.* is factually distinguishable. In that case, the dispositional hearing occurred some months after the minor was taken into DCFS custody and, during those months, the mother had complied with all her recommended service plans and had corrected the conditions that caused the minor to be removed from her care. *Id.* ¶ 64. Further, the mother's mental health was at issue in that case and the evidence showed that the mother had sought out therapy and medication and had made good progress. Further, DCFS and CASA had allowed unsupervised visitation and the mother's therapist opined that she had no concerns about the mother caring for the minor as long as mother continued with her therapy and medication. *Id.* ¶ 65. The facts in *K.E.S.* are not on par with those in the present case. Here, unlike *K.E.S.*, respondent had just started her service plans and she was not yet allowed unsupervised visitation. There was no evidence of significant progress in the recommended services or that respondent corrected the conditions that led to the minor's removal. Accordingly, *K.E.S.* does not warrant a different outcome in the present case.

¶ 62    We acknowledge that the facts in this case are not among the most severe that our courts have encountered, and the record shows that respondent is thus far cooperating with her recommended services. However, upon review, we cannot conclude that the trial court should have reached the opposite result. *Juan M.*, 2012 IL App (1st) 113096, ¶ 49.

¶ 63                                    III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 65    Affirmed.