2026 IL App (4th) 260046-U

NOS. 4-26-0046, 4-26-0048, 4-26-0050, 4-26-0052, 4-26-0054 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 8, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.R., Shy. R., Sham. R., J.R., and Shan. R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | Nos. 25JA67 |
| v. | ) | 25JA68 |
| Morrio R., | ) | 25JA69 |
| Respondent-Appellant). | ) | 25JA70 |
| | ) | 25JA71 |
| | ) | |
| | ) | Honorable |
| | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed the trial court's judgment, concluding the court's determination wardship was in the best interests of the minors was not against the manifest weight of the evidence.

¶ 2     Following an adjudicatory hearing, the trial court determined the minors, Shan. R. (born November 2021), Sham. R. (born May 2015), J.R. (born May 2017), and Shy. R. (born January 2014) were neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2024)), and T.R. (born February 2008) was abused and neglected under section 2-3(1)(b), (2)(i) of the Act (*id.* § 2-3(1)(b), (2)(i) (West 2024)). After a dispositional hearing, the court found it was in the best interests of T.R. to be made a ward of the court with a permanency goal of independence. The court also found it was in the best interests of Shy. R.,

Sham. R., J.R., and Shan. R. to be made wards of the court with permanency goals of remain home with respondent, Morrio R., the father of all the minors. Respondent appeals, challenging the court's determination of wardship only as to Shy. R., Sham. R., J.R., and Shan. R. (We note that although respondent also filed a notice of appeal as to the dispositional order relating to T.R., he advised this court he has opted to present no argument challenging that order. We further note the minors' mother is not a party to this appeal.) We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On August 6, 2025, the State filed petitions for adjudication of wardship alleging Shy. R., Sham. R., J.R., and Shan. R. were neglected by being in an environment injurious to their welfare and T.R. was abused as a result of physical abuse and neglected by being in an injurious environment. The petitions alleged the mother of the minors, Tiffany R., battered T.R. in a car while the other minors were present, then left T.R. stranded on a highway without a phone. The petitions further alleged respondent (1) made no effort to defuse the situation, despite being on the phone with Tiffany at the time the incident occurred, (2) subsequently failed to obtain an order of protection to protect the minors from Tiffany, and (3) yelled at T.R. that the situation was her fault.

¶ 5        The State also filed petitions for temporary custody of the minors, which the trial court granted. However, on August 15, 2025, the court vacated its order for temporary custody, returned custody to respondent, and entered a protective order requiring respondent to abide by certain conditions.

¶ 6                                 A. Adjudicatory Hearing

¶ 7        The trial court held an adjudicatory hearing in October and November 2025. The following evidence was adduced. On August 3, 2025, Sergeant Joseph Miletich of the Silvis Police Department was notified by the Galesburg Police Department that T.R. was at the hospital with

injuries after she and Tiffany got into a fight. Miletich interviewed Tiffany at her home later that night. She told Miletich the incident occurred in the parking lot of a Walmart in Silvis, Illinois. She explained that as she was coming out of the store, she saw T.R. shut the car door on one of her younger siblings, who was also present. As a result, Tiffany and T.R. got into an argument that became physical. Tiffany claimed, later, as they were driving away, T.R. "was trying to jump out" of the vehicle, so Tiffany " 'put her out' " of the car. Tiffany asserted T.R. started the fight. Miletich observed no injuries on Tiffany.

¶ 8 Miletich also spoke with T.R. about the incident, and she reported that while she was in the parking lot, she was trying to take one of her siblings from the car to the bathroom, but another sibling would not let her close the door. T.R. admitted she closed the door on that sibling but not hard. Tiffany saw this and became upset. Tiffany told T.R. she was "going to beat her ass," and when they got into the car, Tiffany struck T.R. in the face. T.R. explained she struck Tiffany back but had to crawl onto the floor of the passenger side of the vehicle because Tiffany kept hitting her. T.R. further stated that after they drove away from Walmart, Tiffany stopped at a no U-turn area on the interstate and "kicked [T.R.] out of the car." After Tiffany drove away, T.R. flagged down a passerby who gave her a ride to the hospital.

¶ 9 Kristin Bruns, a child protection specialist with the Illinois Department of Children and Family Services (DCFS), explained she was assigned to the case upon receipt of a hotline report that T.R. was in the hospital with bone fractures and head injuries after being battered by Tiffany and left on the side of the interstate without shoes or a cell phone. Bruns attended a child advocacy center interview of T.R. on August 4, 2025, and observed T.R. had swelling on her nose and bloodshot eyes. During the interview, T.R. conveyed substantially the same information about the incident she conveyed to Miletich. Specifically, she noted that Tiffany took her, Shy. R.,

Sham. R., J.R., Shan. R., and a cousin to Walmart, and while in the parking lot, one of her siblings would not allow her to close the door. T.R. shut the door on one of her siblings' legs, and after Tiffany saw this, she began arguing with T.R., which led to a physical altercation. While driving away, Tiffany continued to hit T.R., and then she stopped on the interstate and left T.R. there without shoes or a cell phone.

¶ 10    In subsequent interviews Bruns conducted with the other minors, J.R., Shy. R., and Sham. R., corroborated T.R.'s claims, asserting they were in the car when the altercation occurred. Shan. R. stated she felt safe at home.

¶ 11    Bruns also spoke to respondent. He stated he was at work when Tiffany contacted him by phone, stating, " '[T]his girl is trying to fight me.' " Respondent told Bruns he was confused and did not know who she was talking about. Bruns explained that after the incident, the minors were initially placed with respondent because he said he would get an order of protection against Tiffany to protect the minors from her. However, Bruns explained the minors were subsequently placed elsewhere because Bruns learned respondent took Tiffany with him to the hearing to obtain the order of protection and he stated he "was just getting the order of protection because DCFS told him to do so." Additionally, Bruns learned T.R. had e-mailed the child advocacy center stating that she did not feel safe in respondent's home. When Bruns addressed this with respondent, respondent stated he was confused about why T.R. felt unsafe in his home. Bruns testified that when she told respondent the minors' placement would be changed, respondent became upset. He started blaming T.R. and yelling at her that DCFS taking the minors was "all her fault." According to Bruns, T.R. told respondent to look at her face and explained to him she "did not cause the injuries herself."

¶ 12    At the conclusion of the adjudicatory hearing, the trial court determined T.R. was

abused and neglected and Shy. R., Sham. R., J.R., and Shan.R. were neglected. The court found Tiffany inflicted "pretty severe" injuries to T.R. As to respondent, the court found he placed blame for the situation on T.R. and did not seem to "think[ ] anything was wrong" with Tiffany's actions against her. Accordingly, the court concluded Tiffany and respondent were "currently unable to care for the minors [and] that [the] health, safety, and welfare of these minors would be jeopardized." While orally announcing its ruling, the court stated it was in the best interests of the minors that they be made wards of the court. However, after the court confirmed Shy. R., Sham. R., J.R., and Shan. R. were in respondent's care pursuant to a protective order and that guardianship would be addressed at the dispositional hearing, the court said it would "wait for the dispositional hearing" and that "[e]verything is going to remain the same for now. Until the dispositional hearing, everything stays the same." We note the court's written order included no finding that the minors were made wards of the court.

¶ 13                           B. Dispositional Hearing

¶ 14        On January 9, 2026, the trial court held a dispositional hearing. The court first took judicial notice of a dispositional hearing report, an integrated assessment, and a status alert report.

¶ 15        The dispositional hearing report detailed the events giving rise to the case and explained that, after initially placing the minors with respondent, "concerns arose due to his minimization of the incident and lack of protective factors, resulting in the children's temporary placement in relative foster care." It further stated that although T.R. remained in protective custody, the remaining minors were subsequently permitted to return to respondent with oversight from the trial court. The dispositional report recommended the minors be made wards of the court and respondent ordered to maintain appropriate housing, obtain and maintain appropriate income, complete parenting education, and cooperate with mental health services. The report also

- 5 -

recommended Tiffany maintain appropriate housing and income, attend parenting education, cooperate with mental health services, and complete anger management and domestic violence services. The report stated there were no concerns with Shy. R., Sham. R., Shan. R., and J.R. remaining home with respondent but recommended continuing supervision by the court. The report noted a goal of independence was appropriate for T.R. since she would soon turn 18 and expressed a desire not to return home or communicate with her parents.

¶ 16 The integrated assessment noted respondent participated in a DCFS interview, and the following observations were made. The assessment indicated respondent "possibly demonstrated a reluctance to acknowledge concerns" regarding the incident between T.R. and Tiffany. Additionally, he displayed possible emotional dysregulation, and there were anger management concerns. He also had "poor insight into family dynamics and engaged in blaming behavior toward [T.R.] for the children's removal, including yelling at her." The assessment stated that although respondent shows capacity to meet the minors' needs and maintain stability, his capacity to protect the minors appeared to be "compromised." This was demonstrated by respondent's decision to bring Tiffany with him to obtain an order of protection that was intended to protect the minors and telling the trial court he was seeking an order of protection "only at the direction of DCFS." Respondent also displayed patterns of "blaming [T.R.] and exhibiting verbal aggression during conflict, poor communication, low empathy, and difficulty managing emotional responses" that raised concerns about his "ability to maintain healthy, emotionally safe relationships *** and to serve as a consistent protective figure for his children." Additionally, despite being on the phone with Tiffany and hearing the altercation as it occurred, he "did not intervene or attempt to de-escalate the situation." He also had a "tendency to minimize conflict or deflect responsibility." The assessment noted respondent's minimization of family conflict,

inconsistent protective actions, and inability to provide structure indicated a "lack of consistent judgment and follow-through in ensuring his children's safety" that "raise[d] concerns." As such, the assessment recommended "continued monitoring, guidance, and support to ensure the home environment remains safe and structured for the children."

¶ 17    The status alert report detailed respondent's and Tiffany's engagement in services. The report noted respondent had completed parenting classes and had been recommended to engage in counseling. Tiffany, in turn, had completed domestic violence, anger management, and parenting classes.

¶ 18    No additional evidence was presented to the trial court, though Tiffany informed the court she was willing to comply with psychotherapy services. Thereafter, respondent's counsel stated he reviewed the dispositional hearing report with respondent. As to the recommendations therein, counsel noted:

> "The services recommended for him start on paragraph 14, housing, no objection; 15, income, no objection; 16, parenting education, no objection, and I believe that's completed.
>
>    But we object to paragraph 17, being mental health services. In my review of the file and discussion with my client, I think it's an overstep to ask him to do that, and we'd ask the Court to strike that part."

¶ 19    At the conclusion of the hearing, the trial court sought clarification as to why Shy. R., Sham. R., J.R., and Shan. R. could not "be placed on some form of supervision with the parents." The State responded, "I believe *** that that can only be if the [adjudicatory] findings haven't actually been entered, but because we did a contested adjudicatory hearing, I don't know that it's possible at this point." The State also said that because the minors had been placed back

with respondent and visits with Tiffany were likely to increase in frequency as she engaged in her recommended services, the arrangement was similar to a supervision order. Respondent raised no objection.

¶ 20		Thereafter, the trial court entered its dispositional orders, finding it was consistent with the health, welfare, and safety of T.R., Shy. R., Sham. R., J.R., and Shan. R. and in their best interests to make them wards of the court. Guardianship of Shy. R., Sham. R., J.R., and Shan. R. was awarded to respondent. The permanency goal for T.R. was independence, and as to the other minors, the goal was to remain home with respondent. The court found Tiffany was unable to care for, protect, train, or discipline the minors and ordered her to comply with the services recommended in the dispositional hearing report but noted only psychotherapy services remained outstanding. Regarding respondent, the court found he was unable to care for, protect, train, or discipline T.R. but fit, willing, and able to do so as to Shy. R., Sham. R., J.R., and Shan. R. However, the court found respondent needed to "continue to cooperate with [DCFS and] ensure the children's safety during [Tiffany]'s visits." The court also ordered him to complete parenting classes and obtain and maintain appropriate housing and income but did not order him to complete mental health services.

¶ 21		This appeal followed.

¶ 22		II. ANALYSIS

¶ 23		On appeal, respondent argues the trial court erred in ordering Shy. R., Sham. R., J.R., and Shan. R. to be made wards of the court. Respondent claims, contrary to the court's findings, wardship was not in their best interests because he was fit and able to care for them. The State contends respondent forfeited any error relating to the wardship determination and, in any event, the court's finding was not against the manifest weight of the evidence.

¶ 24      We first consider the State's argument regarding forfeiture. "It is well established that, to preserve an alleged error for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it." *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011). A party forfeits his or her right to complain of an error where the position asserted is inconsistent with the position advanced in an earlier court proceeding. *In re Ch. W.*, 408 Ill. App. 3d 541, 547 (2011). Further, a party may not complain of an error that he or she induced or to which he or she consented. *Id.*

¶ 25      Initially, a review of the record establishes respondent neither objected to the trial court's wardship determination in its dispositional order nor raised any issue regarding the dispositional order in a subsequent motion. Accordingly, respondent, on this basis alone, forfeited his contention that the wardship determination was erroneous. See *William H.*, 407 Ill. App. 3d at 870 (concluding the respondent forfeited her challenge regarding wardship where she did not object or present an argument regarding wardship in the trial court).

¶ 26      The record also shows respondent induced or consented to the wardship determination of which he now complains. Respondent raises an argument on appeal that is inconsistent with the position he took below. After the trial court took notice of the dispositional hearing report recommending both that the minors be made wards of the court and that respondent engage in services, respondent's sole objection related to the recommendation that he participate in mental health services. He challenged no other portion of the report and, in fact, agreed to participate in the other recommended services. Notably, a trial court may not enter a dispositional order with respect to a neglected or abused minor unless the minor is first made a ward of the court. See 705 ILCS 405/2-23(1)(a) (West 2024) (providing the "kinds of orders of disposition" that "may be made *in respect of wards of the court*" (emphasis added)); *In re K.E.S.*, 2018 IL App (2d)

170907, ¶ 60. As such, by agreeing to the inclusion of services in the dispositional order, respondent was conceding to the minors being made wards of the court. See *In re T.W.*, 2025 IL App (2d) 240573-U, ¶ 56 ("[B]y arguing that the case should remain open and services monitored, [the] respondent conceded to the minor being made a ward of the court."). Given that concession, his argument on appeal that the court's wardship determination is erroneous is inconsistent with the position he took in the trial court. See *Ch. W.*, 408 Ill. App. 3d at 547.

¶ 27 We find respondent has forfeited this issue by (1) failing to raise it before the trial court, (2) consenting to wardship, and (3) now raising a claim inconsistent with the position taken before the court below. See *William H.*, 407 Ill. App. 3d at 870; *Ch. W.*, 408 Ill. App. 3d at 547; *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007).

¶ 28 Forfeiture aside, respondent's claim that the trial court's wardship determination was improper is unpersuasive. The Act provides a two-step process for an adjudication of wardship. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing on the petition for adjudication of wardship, where the trial court considers only the question of whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2024). The focus of the adjudicatory hearing is centered on whether the child is neglected, abused, or dependent, not on whether the parent caused that condition. *A.P.*, 2012 IL 113875, ¶ 19. It is the State's burden to prove the minor's condition by a preponderance of the evidence. *Id.* ¶ 24.

¶ 29 If the trial court determines the minor is abused, neglected, or dependent, the matter then proceeds to a dispositional hearing, where the court must determine whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2024). As previously noted, the court may not enter a dispositional order with respect to a neglected or abused minor unless the minor is first made a

ward of the court. *Id.* § 2-23(1)(a); *K.E.S.*, 2018 IL App (2d) 170907, ¶ 60. "In contrast to the adjudicatory hearing, where the court determines only whether the child is abused or neglected, the wardship determination at the dispositional hearing 'is based on the best interest to the child when considering the *totality of the circumstances* surrounding the child's life.' " (Emphasis in original.) *In re M.D.*, 2022 IL App (4th) 210288, ¶ 64 (quoting *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15). The court has " 'wide latitude' in determining the best interest of the child during a wardship proceeding." *K.E.S.*, 2018 IL App (2d) 170907, ¶ 61 (quoting *In re April C.*, 326 Ill. App. 3d 245, 261 (2001)). A court may consider evidence of parental deficiencies in the child's environment beyond those alleged in the petition, including information contained in a dispositional report, which provides insight to the court bearing on the totality of the circumstances. *M.D.*, 2022 IL App (4th) 210288, ¶¶ 64-65. "By making a child a ward of the court, a court can, among other things, keep the case open, oversee the provision of services, and enter any protective orders necessary." *K.E.S.*, 2018 IL App (2d) 170907, ¶ 60; 705 ILCS 405/2-23(2), (3) (West 2024). We will not reverse the court's decision at a dispositional hearing unless the findings of fact are against the manifest weight of the evidence. *In re A.R.*, 2025 IL App (4th) 250668, ¶ 69. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.* ¶ 66.

¶ 30        Here, the minors were adjudicated neglected based on the finding Tiffany battered T.R. in front of Shy. R., Sham. R., J.R., and Shan. R. and then left T.R. alone on the interstate. The dispositional hearing report indicated that following the adjudication, "concerns arose" about respondent's "lack of protective factors" and "minimization of the incident" between T.R. and Tiffany. Specifically, the integrated assessment noted respondent displayed possible emotional dysregulation and anger management concerns, "poor insight into family dynamics," "low

empathy, and difficulty managing emotional responses." These findings were evidenced by respondent's failure to intervene during the incident between T.R. and Tiffany, his decision to bring Tiffany with him to obtain an order of protection against her, his comments that he sought an order of protection only at the direction of DCFS, and his behavior of yelling at T.R. and blaming her for the removal of the minors from his custody. The assessment concluded that, due to respondent's minimization of family conflict, inconsistent protective actions, and inability to provide structure, there were "concerns" he lacked the "judgment and follow-through [required] in ensuring his children's safety." Accordingly, the assessment suggested "continued monitoring, guidance, and support to ensure the home environment remains safe and structured for the children" and recommended respondent engage in services.

¶ 31    Case law has highlighted the congruence between a trial court's adjudication of neglect or abuse and a grant of wardship. See *K.E.S.*, 2018 IL App (2d) 170907, ¶ 61 ("[A]lthough the adjudication of neglect or abuse and the wardship determination are two separate steps, we have found no reported case in which a child was adjudicated neglected and yet wardship was *not* granted." (Emphasis in original.)); *T.W.*, 2025 IL App (2d) 240573-U, ¶ 56 ("In light of the trial court's findings of abuse and neglect, we cannot say the wardship finding was against the manifest weight of the evidence."). Here, as a result of the court's wardship determination, the court had the authority to direct respondent to cooperate with DCFS, obtain and maintain appropriate housing and income, and comply with the recommended services, which promoted the safety and welfare of the minors. See *In re A.S.*, 2014 IL App (3d) 130163, ¶ 25. Given the court's adjudication of neglect as to Shy. R., Sham. R., J.R., and Shan. R. and evidence of respondent's lack of "judgment and follow-through [required] in ensuring his children's safety," necessitating the court's direction to respondent to comply with services, we cannot say the court's wardship

finding was against the manifest weight of the evidence.

¶ 32		We further note that, to the extent respondent claims the trial court erroneously ordered the minors be made wards of the court at the adjudicatory hearing, the record refutes that claim. Although the court noted, at that stage, it believed it was in the minors' best interests to be made wards of the court, the court—following clarification by the parties—backtracked, stating, "Everything is going to remain the same for now. Until the dispositional hearing, everything stays the same." Additionally, the court's written order included no wardship finding. Respondent's argument that the court committed error on that basis, therefore, is meritless.

¶ 33		In light of the foregoing, we conclude the trial court's wardship determination was not against the manifest weight of the evidence. Respondent has failed to establish the court's dispositional order was erroneous.

¶ 34				III. CONCLUSION

¶ 35		For the reasons stated, we affirm the trial court's judgment.

¶ 36		Affirmed.